[Civ. No. 24494. Fourth Dist., Div. One. July 29, 1981.]

ROLAND ANTONIO TALAMANTEZ, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

**COUNSEL**

Allen Bloom for Petitioner.

No appearance for Respondent.

Edwin L. Miller, Jr., District Attorney, Peter C. Lehman and Paul M. Morley, Deputy District Attorneys, for Real Party in Interest.

**OPINION**

**STANIFORTH, J.—** ■ In this first degree murder case, petitioner challenges the procedure by which special circumstances allegations were added by amendment to the information in the superior court after the preliminary hearing had been held. After the denial in superior court of his motion under Penal Code section 995 to strike the death penalty allegations, petitioner seeks a writ of prohibition here, Penal Code section 999a, to compel dismissal of those charges. ■ The motion under section 995 followed by review under section 999a is an appropriate means to attack special circumstances allegations. (*Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944, 954-955 [153 Cal.Rptr. 720].)

We originally denied the petition for writ of prohibition. The matter is now before us by order of the California Supreme Court directing issuance of the alternative writ.

Petitioner contends:

1. The failure before preliminary hearing either to allege special circumstances or otherwise to manifest an unequivocal prosecutorial intent

to seek the death penalty denied petitioner fair notice of the charges against him and an opportunity to rebut those charges at the preliminary hearing.

2. Because persons indicted by a grand jury would have earlier notice, at the time of indictment, of the special circumstances allegations, petitioner is denied equal protection of the laws as compared with indicted defendants.

3. The evidence is insufficient to go to trial on each of the alleged special circumstances here.

The special circumstances which have been alleged here are Penal Code section 190.2, subdivision (a)(16) (intentional killing because of race); section 190.2, subdivision (a)(17)(ii) (murder while engaged in commission of kidnaping in violation of §§ 207 and 209); and 190.2, subdivision (a)(18) (intentional torture murder).[1]

The facts developed at the preliminary hearing suggest a racially motivated torture murder by petitioner and two codefendants. Prosecution witness Cassell testified he encountered the three at the Sunshine Summit store near Highway 79 off San Ignacio Road and petitioner told Cassell he and his companions were going to go "nigger hunting." Cassell had just previously seen a black man walking along San Ignacio Road near the highway toward the Indian reservation nearby. Petitioner and the codefendants drove in that direction in a pickup truck and an automobile, followed by Cassell in another vehicle. Cassell saw petitioner seize the man and begin beating him, then throw him into the back of the truck and continue to beat him while he pleaded for his life and to be allowed to get out of the neighborhood. When the truck broke down the defendants threw the victim into the trunk of the automobile, drove about two miles, then threw the victim out of the trunk and continued to beat him until he died. The next day petitioner met other witnesses (Gorman and Bermek) while they were discussing the discovery of the victim's body. Petitioner told them with a smile "The nigger was in the wrong place at the wrong time." He also bragged about killing the victim. The victim had extensive bruises and lacerations to the head, neck and chest area and a fractured larynx, and he died of the head and neck injuries.

---

[1]All references are to the Penal Code unless otherwise specified.

Procedurally, the following events occurred: the codefendants were arraigned on August 5, 1980, but petitioner was not arraigned until September 10, 1980, because he had fled to Mexico. When he was arraigned, the preliminary examination had already been held as to the codefendants. Petitioner was arraigned September 10, 1980, on a complaint charging murder (§ 187) and three prior convictions, and the preliminary examination was held October 2, 1980. Although formal charges of special circumstances warranting the death penalty were not made at the time of preliminary examination, the deputy district attorney assigned to the case (Elias) was then considering whether special circumstances were appropriate. He later testified (on the motion to strike the special circumstances allegations) he spoke to petitioner's counsel shortly before the first scheduled preliminary hearing date of September 23, 1980, and then opposed a long continuance, both to permit joinder of the codefendants' case to petitioner's and also to facilitate a decision regarding special circumstances. Petitioner's counsel testified he received no verbal notice regarding special circumstances from Elias until sometime near the end of the preliminary hearing, but he also indicated he knew and considered special circumstances to be a real possibility in this case. Petitioner was arraigned in the superior court on October 16, 1980, and the People moved to amend the information to allege special circumstances on October 27. The court considered the motion to amend at hearings from November 17 to 20, 1980, and granted the motion November 20. Petitioner unsuccessfully demurred to the amended information, then was arraigned, pleaded not guilty and moved to strike the amendment under Penal Code section 995. The testimony received during the November hearings on the motion to amend was received by stipulation at the hearing on the section 995 motion.

DISCUSSION

I

Addition of Death Penalty Allegations After Preliminary Hearing

After pointing out the immense qualitative difference between imposing the death penalty and other punishments, as well as the strict scrutiny and precision applied in review of capital cases, petitioner contends his commitment was illegal because the failure to allege the special circumstances in the complaint denied fair notice of the nature of the charges and undercut any opportunity to rebut them at the pre-

liminary hearing. He points out the purpose of the preliminary examination in California is to weed out unsupported charges and to afford discovery, hence denial at such stage of full rights of cross-examination and presentation of affirmative defense evidence requires dismissal of the charges. (E.g., *Jennings* v. *Superior Court* (1967) 66 Cal.2d 867 [59 Cal.Rptr. 440, 428 P.2d 304]; *Gallaher* v. *Superior Court* (1980) 103 Cal.App.3d 666 [162 Cal.Rptr. 389]; *Jones* v. *Superior Court* (1971) 4 Cal.3d 660 [94 Cal.Rptr. 289, 483 P.2d 1241]; *McDaniel* v. *Superior Court* (1976) 55 Cal.App.3d 803 [126 Cal.Rptr. 136].)

In noncapital cases, petitioner admits California law under sections 739 and 1009 and relevant cases permit amendment of the information to add charges or enhancements which are supported by the actual evidence at the preliminary hearing, provided the facts show due notice by proof to the accused. (*Jones* v. *Superior Court, supra,* 4 Cal.3d 660, 664-665; *People* v. *Superior Court (Grilli)* (1978) 84 Cal.App.3d 506, 510 [148 Cal.Rptr. 740]; *People* v. *Donnell* (1976) 65 Cal.App.3d 227, 233 [135 Cal.Rptr. 217]; *People* v. *Flowers* (1971) 14 Cal.App.3d 1017, 1020 [92 Cal.Rptr. 647]; *People* v. *Hall* (1979) 95 Cal.App.3d 299 [157 Cal.Rptr. 107].) However, none of these cases involved death penalty special circumstances allegations. The *Ghent* case, *supra,* establishes such allegations may be challenged on a section 995 motion, which distinguishes special circumstances allegations from other penalty enhancements, but that holding does not necessarily require special circumstances be alleged before the preliminary hearing, or otherwise imply they must be treated differently than other offenses which may be alleged for the first time after the preliminary hearing provided, as stated, there is notice and satisfaction of due process requirements.

The People rely on *People* v. *Superior Court (Colbert)* (1978) 78 Cal.App.3d 1023 [144 Cal.Rptr. 599]. In that case, however, the trial court had stricken the special circumstances allegations because it viewed the death penalty as unconstitutional, and the appellate court reinstated the allegations. No issue was made of the fact the allegations were added by way of amending the information.

We find no cases in California or elsewhere holding allegations warranting imposition of the death penalty must be charged before the preliminary hearing. ▇ As in California, the general rule elsewhere appears to require sufficient notice of the nature of the case to afford adequate opportunity for preparation of the defense. (See, e.g., *People*

v. *Brownell* (1980) 79 Ill.2d 508 [38 Ill.Dec. 757, 404 N.E.2d 181, 189-191].) The court in *People* v. *Brownell, supra,* stated at page 189: "An indictment's allegations must be set out with such specificity or particularity that the accused is informed of the offense with which he is charged and enabled to prepare his defense and further, that he is protected against being later prosecuted for the same crime." The court went on to point out the allegations of the indictment, although not specifically charging the required aggravating factors, were sufficient in stating charges of murder, aggravated kidnap and rape which would justify imposition of capital punishment for intentional murder in the course of kidnap and rape. The court said: "[W]e think the indictment's allegations specifically and particularly informed the defendant of the charges against him so that he could prepare his defense and so that he was fully apprised, from indictment on, that he could potentially receive the death sentence." (*Id.,* at p. 190.)

In an attempt to show prejudice because of the amendment, petitioner's attorney argued had he known special circumstances would be alleged, he would have sought special funds authorized for the investigation of capital cases (§ 987.9) and would have investigated more thoroughly the areas of racial killing, torture murder and kidnap, as well as obtained extra materials through the services of the state public defender's office and other agencies which offer special assistance in capital cases. The attorney did not state, however, why he could not do those things after the amendment. The preliminary hearing took place October 2, 1980, after arraignment September 10. The information in superior court was filed October 16, and it was amended to charge special circumstances on October 27. The delay is thus quite short, not quite two months. Petitioner has had since then to do all the things stated and has made no credible showing of prejudice. Further, he has not described any specific tactics which he would have used at the preliminary hearing had special circumstances been alleged then nor otherwise indicated what he might have done differently. Even without special circumstances allegations, petitioner was here defending a serious potential first degree murder charge. The facts relevant to the special circumstances, such as commission of other felonies, torture or racial motivation, are also relevant to the degree of the offense, and it is inconceivable petitioner's attorney would not have attempted to negate such factors in the face of a first degree murder charge but would have done so had he known the death penalty would certainly be sought. Further, he admits knowing the death penalty was under consideration and was a real possibility and does not explain why replacing this

knowledge with certainty would have in any way affected his tactics or his opportunities at the preliminary hearing. The transcript of the preliminary hearing shows considerable questioning about the racial motivation, the nature of the killing and the asportation, as may be seen from the illustrative excerpts.[2] Accordingly we find the demonstration of any real prejudice here wholly unconvincing, as did the trial court.

---

[2]"Q. To the best of your recollection, can you tell the judge what Mr. Talamentez told you as to how he was killed?

"A. Yeah. He said he beat him and he choked him to death.

"Q. Was there any discussion as to stabbing that you recall?

"A. He said that he wanted to stab him, but nobody else really wanted to kill him, but he went ahead and killed him anyway, and he choked him to death.

"Q. Judging from the expression and the demeanor of Roland when he told you this, how would you describe his demeanor, expression, his attitude at that time?

"A. Almost as though he was proud of it.

" . . . . . . . . . . .

"Q. Did Roland tell you or state anything to you as to what the black man was saying prior to the time he was killed?

"A. Well, he was more or less—the way I—he was more or less pleading—asking him, you know, not to kill him. You know, it's the only way—the only thing I can say is they beat him, put him in the trunk and killed him.

"Q. Roland told you that the black man was asking not to be killed?

"A. Yeah, more or less.

" . . . . . . . . . . .

"Q. While you were at the Sunshine Summit Store, did Roland make any statements as it relates to a black individual?

"A. He said we were going nigger-hunting.

"Q. Prior to that statement, had you seen a black man anywhere near the Indian reservation?

"A. He was walking up the road on the reservation.

"Q. And by 'up the road,' you mean on Highway 79?

"A. He was off that—it was on the road that goes to the reservation. It's off the highway.

"Q. San Ignacio?

"A. Yes.

"Q. At some time after Roland made that statement that you testified to, did all you leave the Sunshine Summit Store?

"A. Yes.

"Q. In what vehicles did you leave?

"A. I left in the truck Scott was driving; and Joe was in it and Roland and Edie; and we left in that, and Glenn and my brother Bob and Alvin and Aussie were in Glenn's car.

"Q. What kind of truck was it that you were in?

"A. A blue Ford.

"Q. What kind of car was it that Glenn was driving?

"A. A white Ambassador.

"Q. After leaving the store, the Sunshine Summit Store, did you then see the black man?

"A. Yes. He was walking—

"Q. Where was he?

"A. He was walking down the road on Los Tules.

## II

### Denial of Equal Protection

Here petitioner argues a person indicted by a grand jury would be entitled to earlier specificity than one charged by information because the indictment, unlike the information, cannot be later amended. In light of the great expansion of the right to be charged by information, with attendant preliminary examination, after the decision in *Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584 [150 Cal.Rptr. 435, 586 P.2d 916], the issue is largely academic now in California. Further, bearing in mind the much greater panopoly of rights attendant on a proceeding by information, as contrasted with indictment, the equal protection argument advanced here is wholly unpersuasive. The safeguard of rights here is the due process notice afforded by the actual evidence developed at the preliminary hearing, a safeguard lacking in the indictment procedure. Here, as stated, we find the evidence at the preliminary adequately raised the spectre of possible death penalty allegations.

## III

### Sufficiency of the Evidence to Support Capital Charges

■ The traditional test in determining a motion under section 995 is whether there is some rational ground to assume an offense has been

---

"Q. What happened at that time?

"A. We seen him. He turned around.

"Q. What happened next?

"A. We stopped right beside him and Roland got out and said, 'Hey, nigger' and started beating him up.

"Q. When this was taking place, what did the black man say, if anything?

"A. He was saying 'Leave me alone.' He just—'I just want to get out of the neighborhood.'

"Q. And did Roland say anything in response?

"A. He told him to shut up and just kept on hitting him.

"Q. When you say 'hitting him,' was he using his hands, his feet?

"A. His hands.

"Q. Were they open or in a fist?

"A. In a fist.

"Q. This was on the side of the road, next to the truck?

"A. Yes.

"Q. Did the position of the black man move from the side of the truck to some other place?

"A. Into the back of the truck.

"Q. How did that take place?

"A. Roland threw him in the back."

committed by the accused. (*People* v. *Hall* (1971) 3 Cal.3d 992, 996 [92 Cal.Rptr. 304, 479 P.2d 664]; *Rideout* v. *Superior Court* (1967) 67 Cal.2d 471, 474 [62 Cal.Rptr. 581, 432 P.2d 197].) These same standards apply to special circumstances charges. (*Ghent* v. *Superior Court, supra*, 90 Cal.App.3d 944, 955.)

■ The evidence here adequately raises the factual possibilities of either racially motivated murder or torture murder. Although petitioner argues, for instance, the use of the word "nigger" is not enough to show racial motivation, or for further example, the fact the victim begged for his life does not necessarily show the extreme physical pain and deliberate infliction of such pain necessary to prove torture murder, these arguments should be better made on an appeal from a judgment imposing the death penalty since they do no more than question the adequacy of the evidence. The factual possibilities are real enough to permit the People to charge special circumstances. The story told by the People's witnesses describes a deliberate hunt for a black victim, a completely unmotivated murder, with prolonged beating, infliction of terrible, brutal injuries, after dragging the victim about in a truck and then in a locked automobile trunk. We would ill serve the cause of justice to find no possibility of racial or torture murder here.

Regarding the charge of murder in the commission of kidnap, section 190.2, subdivision (a)(17)(ii), petitioner argues both (1) insufficient evidence to show the kidnap was separate from and not incidental to the murder and (2) the statute requires the presence of facts showing both sections 207 (simple kidnap) and 209 (kidnap for robbery). Neither contention has merit.

■ First, the new statute, added by initiative measure November 7, 1978, has not yet been judicially interpreted to require the same separation of murder and related offense as was necessary to impose the death penalty under former law. (See, e.g., *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468].) Even if those standards applied here, however, there is a jury question of intent raised by these facts. It is possible petitioner may have intended to kidnap the victim in order to torture him, with the murder occurring later, as an afterthought, an accident, or the result of a change in intent. The asportation here was no mere technical movement of the victim and it certainly increased his danger and his suffering. Accordingly a challenge to the allegation on this ground is premature at best.

■ Second, we do not accept petitioner's reading of the statute as requiring both types of kidnap to be present. It is true the statute uses a conjunctive phrase, "[k]idnapping in violation of Sections 207 and 209." (§ 190.2, subdivision (a)(17)(ii).) However, since section 207 is a lesser included offense of section 209, if both were required it would not be necessary and would be absurd to include the reference to section 207. The more reasonable statutory construction is that either form of kidnap suffices for invocation of the extreme penalty. Looking at subparagraph (17) of section 190.2, subdivision (a), as a whole, it is a conjunctive enumeration of the various crimes which, if accompanied by murder, may result in the death penalty being applied. The separate enumeration of section 207 and section 209 in subsection (ii) of (17) can thus be reasonably seen as two of these enumerated offenses, also listed conjunctively, but grouped together within one subsection because of their close relationship. Thus, just as both robbery (i) and rape (iii) are individually sufficient, and both are not required, so also are simple kidnap or kidnap for robbery (both in (ii)) each individually sufficient for the statutory purpose.

## CONCLUSION

We are acutely aware this is a capital case (*Ghent* v. *Superior Court, supra,* 90 Cal.App.3d 944, 953-954), and are likewise cognizant of the growing importance attached to the rights of criminal defendants at the preliminary hearing stage of the proceedings. (See, e.g., *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 523 [165 Cal.Rptr. 851, 612 P.2d 941].) We have in the past, however, declined to compel reversal of judgment for errors at the preliminary hearing when no real prejudice to the defendant was shown (e.g., *People* v. *Hampton* (1981) 116 Cal. App.3d 193 [172 Cal.Rptr. 25]), and here we perceive none, even after careful scrutiny. The Penal Code states omissions or defects in the information are not reversible error without substantial prejudice. (§ 960.) Further, we believe if a new rule is to be fashioned for capital cases only concerning the procedure for amending the information after preliminary hearing, that innovation should emanate from the Supreme Court, charged with particular responsibility for capital cases, and with special expertise born of experience in that area of law. Finally, we agree with the People it is undesirable to compel charging death penalty allegations at the earliest possible moment in doubtful cases, because such a rule might produce considerable overcharging of the extreme penalty and might also invoke the use of such charges as "bargaining

chip" to induce guilty pleas. We conclude issuance of a prerogative writ from this court is not justified here.

The petition for a writ of prohibition is denied.

Brown (Gerald), P. J., and Cologne, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied October 22, 1981. Bird, C. J., and Kaus, J., were of the opinion that the application should be granted.