[Crim. No. 13082. Fourth Dist., Div. One. Dec. 24, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD RAUL RIVERA, Defendant and Appellant.

**138**

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Charles M. Sevilla, Chief Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Steven H. Ziegen and Jesus Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WORK, J.**—Richard Paul Rivera was convicted of first degree burglary (Pen. Code, § 459)[1] and assault with intent to commit murder (§ 217), the latter being accompanied by three enhancing allegations. He challenges the convictions on multiple grounds including impermissibly vindictive prosecution, prejudicial denial of a continuance to conduct a lineup, prejudicially admitting his postarrest statement taken in violation of *Miranda,* and instructional error regarding malice. We conclude the relevant facts show the addition of the count alleging assault with the intent to commit murder after Rivera rejected the prosecutor's second plea bargain offer was not impermissibly vindictive and did not violate due process of law as guaranteed under either the United States or California Constitutions. We also find Rivera's remaining contentions to be meritless and affirm.

*Factual Background*

When Julie Rogers returned to her apartment on August 30, 1980, at about 11 p.m., she noticed an apartment window open with the screen missing. She then heard noises from inside as if someone hurried to a window, opened it, and jumped outside causing a crashing sound. She found no one inside, but the place had been ransacked, her jewelry, coins and a camera being taken.

Meanwhile, James Miller, walking near the apartment building, heard a loud noise and saw a man jump a fence of the apartment building and walk toward him. When approximately 20 to 30 feet from Miller the man turned and walked toward some parked cars. Simultaneously, John Nudek, Miss Rogers' neighbor, heard the loud noise; instructed his wife to call the police; and went outside where he saw Miller who directed him to where the intruder had gone. Nudek approached Rivera, asking him what he was doing and was told he was waiting for his girl friend who lived close by. Nudek asked where she lived and Rivera pointed to a nearby building, following which Rivera said "get away from me old man," and proceeded to walk toward an alley. Nudek followed him into the alley, a struggle ensued and Rivera then fled, leaving behind Nudek who had been stabbed in the chest.

As Officer Newberry arrived on the scene, he saw a man running diagonally across Utah Street past him. He watched him closely and then

---

[1]All statutory references are to the Penal Code.

continued to Nudek's location. When he arrived the assailant was described as: 5 foot 7, about 165 pounds, of Mexican ancestry, scraggly facial hairs, white T-shirt, moustache, and as wearing dark trousers, a white tank top, black woven sandals, and a scraggly beard. Realizing the person he saw run past him matched this description, Newberry searched for him, later finding Rivera crouched beneath a bush. When apprehended Rivera was wearing no shirt; his face was red and flushed; and he was sweating profusely. The officer recognized him as the same person he had seen earlier and, after searching the bushes, he found a wet, white tank top T-shirt smelling of perspiration. He placed it over Rivera's head and transported him back to Idaho Street where both Nudek and Miller positively identified him as the assailant.

Nudek, a 63-year-old man, suffered multiple stab wounds to the chest, upper abdomen, groin, and hip. Two chest wounds penetrated the lung cavities, collapsing his lungs and later causing pneumonia. If the wounds had not been treated promptly, Nudek's life would have been endangered.

### Procedural History

Rivera was originally charged only with assault with a deadly weapon and burglary (§§ 245, subd. (a), and 459). He was offered a plea to the assault without any special allegation. At the preliminary hearing on September 19, 1980, he unsuccessfully moved to relieve his attorney for failure to request a pretrial lineup. His counsel then moved for a continuance in order to schedule a lineup, which was denied as untimely. He was bound over on both charges and arraigned on the information to which he pleaded not guilty. Two days before the readiness conference, Rivera was told the prosecution intended to file an amended information charging more serious crimes and enhancing allegations. At the conference, he was offered a plea to section 245, subdivision (a), with a section 12022.7 allegation, shown a copy of the amended information and told that after the conference the People would require a plea to the amended information. Rivera rejected the offer. True to his word, the prosecutor then filed the amended information charging Rivera in count one with burglary committed within an inhabited building in the nighttime; with personally using a knife during the burglary (§ 12022, subd. (b)) and inflicting great bodily injury upon the victim (§§ 12022.7 and 1203.075, subd. (a)(6)). In count two, he was charged with assault with intent to commit murder (§ 217), while using a knife (§ 12022.7), and inflicting great bodily injury within the meaning of

section 1203.075, subdivision (a)(6) on a person 60 years of age or older (§ 1203.09, subd. (a)). In count three, he was charged with assault with a deadly weapon (§ 245, subd. (a)), while inflicting great bodily injury within the meaning of section 12022.7. Before trial, the special allegations in count one were stricken, as was the section 1203.075, subdivision (a)(6) allegation in count two. Count three was also dismissed.

Rivera's section 995 challenge to the amended information as retaliatory for persisting in requesting a lineup and punitive for insisting on his right to a jury trial, and because he was refused a preliminary hearing lineup, was denied.

### RIVERA'S DUE PROCESS RIGHTS WERE NOT VIOLATED DURING PLEA BARGAINING

▪ Rivera first contends adding the count alleging assault with intent to commit murder after he refused to accept the prosecutor's second plea bargain offer was impermissibly vindictive and violated due process of law guaranteed under the United States (Fifth Amend.) and California (art. I, §§ 7 and 15) Constitutions requiring his conviction be reduced to the offense originally charged, assault with a deadly weapon.

It is undisputed Rivera was originally charged by complaint and in the original information with one count of assault with a deadly weapon with a single enhancement and one count of burglary. Before the preliminary hearing, Rivera was first offered a plea to the assault without any special allegations. He refused. At the readiness conference, Rivera received a second, less lenient, offer of a plea to the assault, now accompanied by an enhancement for intentionally inflicting great bodily injury. He was also shown a copy of the amended information and told the offer would be withdrawn if rejected. Rivera declined the offer and the amended information was filed.

The United States Supreme Court in *Bordenkircher v. Hayes* (1978) 434 U.S. 357 [54 L.Ed.2d 604, 98 S.Ct. 663], addressed this precise issue. There, the prosecutor offered to recommend a five-year sentence if Hayes pleaded guilty to forgery. He further told Hayes if he did not plead guilty and "gave the court the inconvenience and necessity of a trial," then he would seek reindictment under the state's recidivist statute, subjecting him to a mandatory sentence of life imprisonment

because of two prior felony convictions. Hayes chose to stand trial and the prosecutor carried out his threat. Hayes was convicted and sentenced accordingly. The Supreme Court first carefully defined the issue in dispute by stating: "While the prosecutor did not actually obtain the recidivist indictment until after the plea conferences had ended, his intention to do so was clearly expressed at the outset of the plea negotiations. Hayes was thus fully informed of the true terms of the offer when he made his decision to plead not guilty. This is not a situation, therefore, where the prosecutor without notice brought an additional and more serious charge after plea negotiations relating only to the original indictment had ended with the defendant's insistence on pleading not guilty. [Fn. omitted.] As a practical matter, in short, this case would be no different if the grand jury had indicted Hayes as a recidivist from the outset, and the prosecutor had offered to drop the charge as part of the plea bargain." (*Bordenkircher* v. *Hayes, supra,* 434 U.S. 357, 360 [54 L.Ed.2d 604, 608].) The court found no due process violation, recognized the plea bargaining process as an important component of the criminal justice system (*id.* at p. 362 [54 L.Ed. 2d at p. 609]), and reasoned there is no element of punishment or retaliation in the "give-and-take" of plea bargaining so long as the accused is free to accept or reject the prosecutor's offer (*id.* at p. 363 [54 L.Ed.2d at p. 610]). The court further explained: "While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable'—and permissible—'attribute of any legitimate system which tolerates and encourages the negotiations of pleas.' *Chaffin* v. *Stynchcombe, supra,* [412 U.S.,] at 31. It follows that, by tolerating and encouraging the negotiation of pleas, this Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forego his right to plead not guilty." (*Bordenkircher* v. *Hayes, supra,* 434 U.S. 357, 364 [54 L.Ed.2d 604, 611].)

*Bordenkircher* binds us on this issue as it relates to the federal Constitution. (*Chesapeake & Ohio Ry.* v. *Martin* (1931) 283 U.S. 209, 220-222 [75 L.Ed. 983, 990, 51 S.Ct. 453, 458; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 673, pp. 4586-4587.) Here the threat of filing the amended complaint was made during plea negotiations, while Rivera was represented by counsel. He fully understood the amended information would be filed if he did not accept the pending offer. Rivera was as free to accept or reject the offer as if the filed information

already contained the additional charge and allegations, and the prosecutor had offered to drop them as part of a plea bargain.

Rivera's reliance on *United States* v. *Currie* (9th Cir. 1981) 653 F.2d 1300, is misplaced. There, Currie was originally charged with a misdemeanor and notified the prosecution approximately three weeks before trial, of his intent to stand trial. The prosecutor later informed defense counsel he intended to seek an indictment charging Currie with a felony, under the same statute, thereby increasing the maximum possible sentence tenfold. Currie was given one week to plead guilty to the misdemeanor in exchange for the prosecution's abandonment of its intent to indict him. He refused and was indicted, but successfully moved to dismiss the indictment on the ground of vindictive prosecution. The Ninth Circuit affirmed, factually distinguishing *Bordenkircher* as follows: (1) there were no plea negotiations before Currie's interposition of his not guilty plea; (2) "no offer was made—rather the prosecutor presented a *fait accompli* after the fact of pleading;" (3) Currie apparently had no notice of the prosecutor's intent until after he decided to stand trial on the misdemeanor charge and had communicated that intent to the prosecutor; and (4) it was unnecessary to prove additional facts to support the superseding charge. (*United States* v. *Currie, supra*, 653 F.2d 1300, 1302.)

*Currie* is grossly distinguishable from Rivera's scenario. In the former, the prosecutor's retaliatory ultimatum in response to the defendant's decision to go to trial, was not within a factual setting characterized by either plea negotiations or the aura of fair bargaining. However, here the threat of filing an amended information emerged as a "bargaining chip" during plea negotiations after Rivera had rejected the prosecutor's previous offer. Unlike *Currie*, Rivera had adequate notice of the prosecutor's intent. Finally, although the additional charge of assault with the intent to commit murder involved only the necessity of proving additional elements and not facts, the enhancing allegations, however, required the proof of additional facts.[2]

---

[2] We note the United States Supreme Court recently granted certiorari in *United States* v. *Goodwin* (1981) 454 U. S. 1079 [70 L.Ed.2d 613, 102 S.Ct. 632], vacating the opinion in 637 F.2d 250, after the circuit court had reversed a felony conviction for denial of due process where defendant was originally charged with various petty offenses and misdemeanors; plea negotiations were fruitless and defendant elected to proceed with a jury trial; the prosecutor never mentioned the possibility of seeking to have him indicted on a felony; and, upon transfer to district court for trial, the prosecutor sought and obtained a felony indictment.

We independently review this matter under the California Constitution under our authority to construe provisions of the California Constitution which may provide greater protections for our citizenry than textually parallel provisions of the federal Constitution. (*People v. Pettingill* (1978) 21 Cal.3d 231, 247 [145 Cal.Rptr. 861, 578 P.2d 108]; *People v. Hannon* (1977) 19 Cal.3d 588, 606-607, fn. 8 [138 Cal.Rptr. 885, 564 P.2d 1203]; *Serrano v. Priest* (1978) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929]; *People v. Disbrow* (1976) 16 Cal.3d 101, 114-115 [127 Cal.Rptr. 360, 545 P.2d 272].) For, our Constitution "is, and always has been, a document of independent force. Any other result would contradict not only the most fundamental principles of federalism but also the historic bases of state charters." (*People v. Brisendine* (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099].) Indeed, article I, section 24, of the California Constitution provides: "Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution."

Rivera offers no California precedent construing the state Constitution which rationalizes or mandates a result different than *Bordenkircher v. Hayes, supra,* 434 U.S. 357, perhaps because the principles underlying state law regarding plea bargaining and vindictive prosecution derive from United States Supreme Court precedent. Nevertheless, for the reasons which follow, we conclude Rivera was not denied due process under the California Constitution.

Plea bargaining is an accepted and established practice within this state, indispensable to the efficient administration of criminal justice. (*People v. West* (1970) 3 Cal.3d 595, 604 [91 Cal.Rptr. 385, 477 P.2d 409]; *In re Lewallen* (1979) 23 Cal.3d 274, 280 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823]; §§ 1192.1-1192.5.) Pragmatically, "[o]ur present system of criminal justice cannot realistically provide each defendant with his day in court." (Bechefsky & Katkov, *Plea Bargaining: An Essential Component of Criminal Justice* (1977) 52 State Bar J. 214, 217.) This realism is expressed by Justice Stewart in *Bordenkircher v. Hayes, supra,* 434 U.S. 357, 363 [54 L.Ed.2d 604, 610] where he states "the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty."[3]

---

[3]A case comment on *Bordenkircher v. Hayes, supra,* 434 U.S. 357, in volume 2 of the Criminal Justice Journal (1979) at page 406, notes "[a] prosecutor's quest for justice sometimes may be pushed aside by an enthusiasm for conviction." The comment suggests "a prosecutor must never lose sight of his responsibility" to seek justice, not

Critics of *Bordenkircher* stress its apparent departure from the principles announced in *North Carolina* v. *Pearce* (1969) 395 U.S. 711 [23 L.Ed.2d 56, 89 S.Ct. 2072], and *Blackledge* v. *Perry* (1974) 417 U.S. 21 [40 L.Ed.2d 628, 94 S.Ct. 2098]. (See e.g. Comment (1979) 2 Crim. Justice J. 401.) In *Pearce*, after the defendant appealed his conviction, obtained a reversal, was retried and again convicted, and sentenced more severely, the Supreme Court held that due process prohibits vindictiveness in resentencing, reasoning that the apprehension of such vindictiveness may unconstitutionally deter the exercise of one's right to appeal or collaterally attack his first conviction. Thus, due process mandates a defendant not be shackled with fear of retaliation by the sentencing judge. (*North Carolina* v. *Pearce, supra*, 395 U.S. 711, 723-725 [23 L.Ed.2d 656, 668-669, 89 S.Ct. 2072, 2080].) This concept was extended in *Blackledge* where a defendant convicted in a state court on a misdemeanor assault charge sought his statutory right to trial de novo on appeal. The prosecutor responded by securing a felony assault indictment based upon the same conduct. The Supreme Court held the prosecutor's unexplained "upping the ante" violated due process, even in the absence of any evidence the prosecutor acted in bad faith or maliciously. (*Blackledge* v. *Perry, supra*, 417 U.S. 21, 27-29 [40 L.Ed.2d 628, 634-635, 94 S.Ct. 2098, 2102].)

This critical reliance upon *Pearce* and *Blackledge* is misplaced. Our criminal justice system is characterized by continual compromise between the efficiency of our prosecutorial and judicial resources and maximum due process. The disputed prosecutorial conduct here, as in *Bordenkircher*, does not offend due process because it is consistent with the governmental interest of promoting efficient administration of criminal justice by expediting resolution of pending criminal matters, lessening the burden upon our prosecutorial and judicial resources and by furthering the economic allocation of these finite resources. It emerges from a fair bargaining setting where defendant, guided by counsel, is fully aware of the facts underlying the charges and apprised of his procedural alternatives. Balancing the pertinent considerations, defendant may freely, voluntarily, and intelligently decide whether to go to trial and exercise his accompanying rights, or to waive them within the framework of a plea bargain. Conversely, the appellate,

---

merely to convict. (*Ibid.*) However, at least under the circumstances here, as in *Bordenkircher*, a plea to the original charge was apparently consistent with the prosecutor's good faith, initial reaction to the punitive value of the criminal conduct in dispute and consistent with justice.

postconviction posture of *Pearce* and *Blackledge* lacks this negotiable setting; for, objectively, there exists no valuable consideration the prosecution can offer defendant in exchange for his appellate rights. Granted there exists a parallel state interest in lessening the burden upon our prosecutorial (*Blackledge* v. *Perry, supra,* 417 U.S. 21, 26-27 [40 L.Ed.2d 628, 633-634, 94 S.Ct. 2098, 2102]) and judicial resources; however, this latter interest, standing alone, is insufficient to preserve erroneous judgments in which the state has no cognizable interest (*People* v. *Henderson* (1963) 60 Cal.2d 482, 497 [35 Cal.Rptr. 77, 386 P.2d 677]). Moreover, the burdens upon the prosecutorial machinery and judicial system arising from the appellate process is substantially less than those generated by the trial process. Finally, the right to appeal is vital to the integrity of our criminal justice system and the foreclosure of meritorious appellate review offends our basic notions of justice and due process of law.

*Bordenkircher* has also been faulted for its apparent divergence with the holding of *United States* v. *Jackson* (1968) 390 U.S. 570 [20 L.Ed.2d 138, 88 S.Ct. 1209]. (See e.g. Rubin, *The Resurrection of the Right-Privilege Distinction? A Critical Look At Maher v. Roe and Bordenkircher v. Hayes* (1979) 7 Hastings Const.L.Q. 165, 196-197.) In *Jackson*, the court reviewed a provision of the Federal Kidnaping Act making the crime punishable by death if the jury so recommended. However, it provided no death penalty for defendants waiving their right to jury trial or pleading guilty. The Supreme Court rejected the government's attempt to rationalize the act's inevitable effect of discouraging assertion of the Fifth Amendment right not to plead guilty and deterring the exercise of the Sixth Amendment right to a jury trial as a proper trade-off to avoid the more drastic alternative of mandatory capital punishment in every case, thus, overall, mitigating the severity of punishment. (*United States* v. *Jackson, supra,* 390 U.S. 570, 586 [20 L.Ed.2d 138, 149, 88 S.Ct. 1209, 1219].) Declaring these objectives "cannot be pursued by means that needlessly chill the exercise of basic constitutional rights" (*ibid.*), the court stated: "The question is not whether the chilling effect is 'incidental' rather than intentional; *the question is whether that effect is unnecessary and therefore excessive.* In this case the answer to that question is clear. The Congress can of course mitigate the severity of capital punishment. The goal of limiting the death penalty to cases in which a jury recommends it is an entirely legitimate one. But that goal can be achieved without penalizing those defendants who plead not guilty and demand jury trial. In some States, for example, the choice between life imprisonment and capital punish-

ment is left to a jury in *every* case—regardless of how the defendant's guilt has been determined. Given the availability of this and other alternatives, it is clear that the selective death penalty provision of the Federal Kidnaping Act cannot be justified by its ostensible purpose. Whatever the power of Congress to impose a death penalty for violation of the Federal Kidnaping Act, Congress cannot impose such a penalty in a manner that needlessly penalizes the assertion of a constitutional right. See *Griffin* v. *California*, 380 U.S. 609.

"It is no answer to urge, as does the Government, that federal trial judges may be relied upon to reject coerced pleas of guilty and involuntary waivers of jury trial. *For the evil in the federal statute is not that it necessarily coerces guilty pleas and jury waivers but simply that it needlessly encourages them.* A procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right." (*Id.*, 390 U.S. at pp. 582-583 [20 L.Ed.2d at pp. 147-148, 88 S.Ct. at pp. 1216-1217], italics added, fns. omitted.)

However, the *Jackson* rationale is to be distinguished from *Bordenkircher* in that within the latter, the constitutional chill attributable to plea bargaining is deemed minimal when weighed against the need to promote the smooth and efficient operation of our criminal justice system and thus guarantee the administration of justice. *Bordenkircher* is impliedly premised upon the reality that there does not exist a practical and reasonable alternative to plea bargaining.

In his dissent in *Bordenkircher* v. *Hayes, supra,* 434 U.S. 357 at page 368 [54 L.Ed.2d 604 at page 614], Justice Blackmun concludes: "It might be argued that it really makes little difference how this case, now that it is here, is decided. The Court's holding gives plea bargaining full sway despite vindictiveness. A contrary result, however, merely would prompt the aggressive prosecutor to bring the greater charge initially in every case, and only thereafter to bargain. The consequences to the accused would still be adverse, for then he would bargain against a greater charge, face the likelihood of increased bail, and run the risk that the court would be less inclined to accept a bargained plea. Nonetheless, it is far preferable to hold the prosecution to the charge it was originally content to bring and to justify in the eyes of its public. (Fn. omitted.)" However, is it? We think not. Having adopted the plea bargaining process, it is inconsistent to prevent a prosecutor from

employing his charging power as leverage to negotiate a plea bargain.[4] Indeed, if a prosecutor was required to charge or threaten to charge, what he expected to obtain after trial, then there logically would exist no plea bargaining leverage. Absent such leverage, the only way to induce a plea would be for the prosecutor to accept terms at a level below what he considers appropriate for the ultimate disposition of the case, as he must start his negotiations at a level which he considers to be appropriate for the outcome. (Pizzi, *Prosecutorial Discretion, Plea Bargaining and the Supreme Court's Opinion in Bordenkircher v. Hayes* (1978) 6 Hastings Const. L.Q. 269, 290.) Such a requirement or result would "place prosecutors in an intolerable position. They would remain under administrative pressure to conserve state resources and to secure a high percentage of pleas, yet be instructed to charge in the 'best interests of the state' *without* thought of plea bargaining leverage." (*Id.*, at p. 291.) It would breed a prosecutorial tendency to systematically overcharge, a practice Justice Blackmun agrees would inevitably adversely affect a defendant. (*Bordenkircher v. Hayes, supra*, 434 U.S. 357; cf. *Talamantez v. Superior Court* (1981) 122 Cal.App. 3d 629, 639-640 [176 Cal.Rptr. 800].) Consequently, it would hinder the attainment of justice by undermining the fairness which makes plea bargaining a (somewhat) palatable process.

## THE MAGISTRATE DID NOT ABUSE HIS DISCRETION IN DENYING RIVERA A CONTINUANCE TO CONDUCT A LINEUP

■ Due process mandates an accused be afforded a pretrial lineup where appropriate and upon timely request. However, this right arises "only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Evans v. Superior Court* (1974) 11 Cal.3d 617, 625 [114 Cal.Rptr. 121, 522 P.2d 681].) Moreover, the determination of whether eyewitness identification constitutes a material issue and whether fundamental fairness mandates a lineup within a particular case rests solely within the broad discretion of the trial judge or magistrate. (*Id.*, at pp. 625, 627.) Finally, "the resolution here to be made is one which must be arrived at after consideration not only of the benefits to be derived by the accused and the reasonableness of his re-

---

[4]"The prosecutor should not bring or seek charges greater in number or degree than he can reasonably support with evidence at trial." (ABA, Standards Relating to the Prosecution Function and the Defense Function, "The Prosecution Function" (Approved Draft 1971) § 3.9(e), p. 93.)

quest but also after considering the burden to be imposed on the prosecution, the police, the court and the witnesses." (*Id.*, at p. 625.)

Just before the preliminary hearing examination, Rivera moved to relieve his court-appointed counsel for failing to request a lineup. Upon court inquiry, counsel responded that he made no motion because any identification then made by the victim could arguably be a product of the showup at the scene of the crime. The motion was denied. Counsel then moved to continue to schedule such a lineup based upon Rivera's request. The court denied the motion as untimely and without basis. At the preliminary hearing, Nudek and Miller identified Rivera as the assailant.

Relying on a slight discrepancy in the weight aspect of Nudek's description and discrepancies regarding sandals and a full beard in Miller's description in the light of the 20- to 30-foot distance separating Miller and the assailant, Rivera urges the denial of the continuance deprived him of a reasonable opportunity to discover potentially exculpatory evidence to prepare his defense. However, there is no abuse of discretion. Rivera was positively identified by both Miller and Nudek at the showup at the scene of the crime and identified by Officer Newberry as the person running from the crime scene. Even granting the highly suggestive nature of a showup, the accuracy of Nudek's description compounded by the cumulative effect of the weaker description by Miller and the identification by Officer Newberry, substantially supports the magistrate's exercise of discretion in concluding there did not exist reasonable likelihood of a mistaken identification.[5] Moreover, although Rivera had repeatedly sought his counsel to move for a lineup before the preliminary hearing, the motion when made was untimely. A continuance of the hearing would have inconvenienced the court, the prosecution and the witnesses who had been subpoenaed and were already present in court.

Rivera wrongly claims it was ineffective assistance of counsel to delay the motion until after telling the court why it had no merit. (See *People v. Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Defense counsel's decision not to seek a lineup was a tactic knowingly adopted with awareness of all relevant circumstances. In short, his conduct was consistent with that expected from a reason-

---

[5]Unlike the defendant in *Evans* v. *Superior Court, supra*, 11 Cal.3d 617, Rivera was *positively* identified by Nudek and Miller at the showup.

ably competent attorney acting as a diligent advocate, and did not result in the withdrawal of a potentially meritorious defense. (*People* v. *Pope, supra*, 23 Cal.3d 412, 425.)

### RIVERA'S POSTARREST STATEMENT WAS PROPERLY ADMITTED IN EVIDENCE

■ Rivera next asserts he was prejudiced by evidence he spontaneously stated he did not own the white T-shirt when it was placed on him immediately after arrest, and before admonition of his *Miranda* rights.

The circumstances were: after taking Rivera out of the bushes, Officer Newberry patted him down and handcuffed him. Newberry then searched the bushes, discovering a T-shirt which he placed on Rivera. At trial, Rivera testified the shirt was his and that he attempted merely to protest the wearing of the shirt when he uttered the word "no." Over objection, Newberry testified in rebuttal Rivera told him the shirt was not his and he did not want it on.

"[T]he privilege against self-incrimination of article I, section 15, of the California Constitution precludes use by the prosecution of any extrajudicial statement by the defendant, whether inculpatory or exculpatory, either as affirmative evidence or for purposes of impeachment, obtained during custodial interrogation in violation of the standards declared in *Miranda* and its California progeny." (*People* v. *Disbrow, supra*, 16 Cal.3d 101, 113 [127 Cal.Rptr. 360, 545 P.2d 272].) Of significance here, "the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island* v. *Innis* (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 308, 100 S.Ct. 1682, 1689], fns. omitted.)[6]

---

[6]The majority in *Rhode Island* v. *Innis, supra*, 446 U.S. 291 at pages 301-302, [64 L.Ed.2d 297 at page 308, 100 S.Ct. 1682 at pages 1689-1690], explained: "The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police *should know is reasonably likely to evoke an in-*

Rivera claims placing the shirt on him while he was handcuffed constituted the functional equivalent of interrogation, conduct Officer Newberry should have known was reasonably likely to elicit an incriminating response. In light of the cited, extremely broad language employed by the majority in *Rhode Island* v. *Innis, supra,* 100 S.Ct. 1682, we are sympathetic to Rivera's claim; however, even assuming the claim is valid, it is not reasonably probable a result more favorable to Rivera would have been reached had the statement been excluded. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) On this record we are satisfied to a moral certainty that admitting the statement was harmless beyond a reasonable doubt (*Chapman* v. *State of California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Ellers* (1980) 108 Cal.App.3d 943, 952 [166 Cal.Rptr. 888]), considering the positive identifications of Nudek, Miller and Newberry. In reaching this conclusion, we have considered fully the ramifications of the admission of the statement, including its effect upon Rivera's credibility, the makeup of the court's instructions so as to include CALJIC Nos. 2.03 and 2.13 permitting the jury to infer consciousness of guilt, and the prosecutor's closing argument.

## THE JURY WAS PROPERLY INSTRUCTED ON MALICE

■ Rivera contends the trial court's instructions on malice inadequately differentiate the crime of assault with intent to commit murder from assault with intent to commit manslaughter. More specifically, he argues the trial court's definition of express malice was no different than the definition of the intent requirement for manslaughter—the unexcused and unjustified specific intent to kill.[7] Consequently, the jury may well have convicted him of assault with the intent to commit murder without finding malice.

---

criminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Fns. omitted.)

[7]The court instructed in pertinent part: "The defendant is charged in Count 2 of the information with the commission of the crime of assault with the intent to commit murder, a violation of Penal Code Section 217. [¶] Every person who assaults another with the specific intent to commit murder is guilty of the crime of assault to commit murder. [¶] In order to prove the commission of the crime, each of the following elements must be proved: One, that a person was assaulted; [¶] Two, that the assault was made with the specific intent to murder such person; [¶] And three, that the assailant harbored malice aforethought toward the person attacked. [¶] An assault is an unlawful attempt coupled with the present ability to apply physical force upon the person of an-

"The mens rea of the crime of an assault with intent to commit murder requires a specific intent to kill. No element of premeditation is required and hence the crime consists of an assault with an intent to commit either first or second degree murder.... [¶] [Essential to a conviction for this crime is] evidence disclos[ing] the existence of that state of mind amorphously described as 'malice' which would be necessary to convict a defendant of murder in a case in which the victim dies." (*People* v. *Otis* (1980) 111 Cal.App.3d 467, 471-472 [168 Cal.Rptr. 708].) The malice required is express, not implied. (*People* v. *Collie* (1981) 30 Cal.3d 43, 61 [177 Cal.Rptr. 458, 634 P.2d 534]; *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 764-765 [175 Cal.Rptr. 738, 631 P.2d 446].)

The trial court properly instructed on malice by giving defense counsel's modified version of CALJIC No. 8.11.[8] Since the crime charged was assault with the intent to commit murder, the instruction correctly excised all references to express and implied malice, as well as the defi-

---

other. In order to prove assault, each of the following elements must be proved: That an attempt was made to apply physical force on the person of another; [¶] Two, that such an attempt was unlawful; [¶] And three that at the time of such attempt, the person who made the attempt had the present ability to apply such physical force. [¶] To constitute an assault, it is not necessary that any actual injury be inflicted; however, if an injury is inflicted, it may be considered in connection with other evidence in determining whether the assault was committed, and if so, the nature of that assault. [¶] *The intent to murder is the intent to unlawfully kill a human being with malice aforethought. Malice is shown when there is manifested an intent to unlawfully kill a human being. [¶] To manifest means to show or demonstrate plainly. [¶] The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person to be killed. [¶] Aforethought does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act.*" (Italics added.)

[8]Rivera apparently requested the given instruction on malice. However, we decline to apply the doctrine of invited error in order to avoid review of this issue, because (1) we can find no error (*infra*), and (2) he further requested a series of instructions pertaining to manslaughter.

CALJIC No. 8.11 (1979 rev.) provides: "'Malice' may be either express or implied. [¶] [Malice is express when there is manifested an intent unlawfully to kill a human being.] [¶] [Malice is implied [when the killing results from an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with a wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness] [or] [when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life].] [¶] The mental state constituting malice aforethought does not necessarily require any *ill will or hatred of the person killed.* [¶] 'Aforethought' does not imply deliberation or the lapse of considerable time. It only means that the required mental state must precede rather than follow the act."

nition of implied malice, consistent with *People* v. *Collie, supra,* 30 Cal.3d 43, 61, and *People* v. *Murtishaw, supra,* 29 Cal.3d 733, 764-765. Further, the inclusion of the dictionary definition of "manifest," i.e., "[t]o show or demonstrate plainly," was entirely appropriate and helpful, translating the term into layman's language. (See the American Heritage Dict. of the English Language (new college ed. 1979) p. 794, col. 1.)

The difficulty of "formulating an inclusive or comprehensive definition of the malice aforethought which distinguishes murder from manslaughter" has been judicially recognized. (*People* v. *Gorshen* (1959) 51 Cal.2d 716, 730, fn. 11 [336 P.2d 492], disapproved on other grounds in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324 [149 Cal.Rptr. 265, 583 P.2d 1308].) However, the malice instruction here read in its entirety thoroughly states the law pertinent to malice in view of the evidence presented. Rivera's attack on the instruction by simply highlighting the statement that "[m]alice is shown when there is manifested an intent to unlawfully kill a human being" is too narrow; for, instructions must be read in their individual and contextual entirety. (*People* v. *Rhodes* (1971) 21 Cal.App.3d 10, 21 [98 Cal.Rptr. 249]; *People* v. *Wingo* (1973) 34 Cal.App.3d 974, 979 [110 Cal.Rptr. 448], disapproved on other grounds in *People* v. *Rist* (1976) 16 Cal.3d 211, 221 [127 Cal.Rptr. 457, 545 P.2d 561].) "The crucial distinction between murder and manslaughter is that malice aforethought is an element of the former. (§§ 187, 192.)" (*People* v. *Roberts* (1975) 51 Cal.App.3d 125, 138 [123 Cal.Rptr. 893].) Here, the instruction properly defined both "malice" and "aforethought" (1 Witkin, Cal. Crimes (1963) §§ 319-320, pp. 289-291), which together must be found in order to convict on the charged crime.

■ A requested instruction by defendant must be given where evidence exists on that issue. (*People* v. *Tidwell* (1970) 3 Cal.3d 82, 86 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Stevenson* (1978) 79 Cal. App.3d 976, 985 [145 Cal.Rptr. 301].) Here, the trial court properly refused the proffered instructions on voluntary manslaughter, because the evidence did not support any theory establishing voluntary manslaughter through the negation of express malice. Rivera presented no evidence relative to "heat of passion and provocation" or "imperfect self-defense." Further, such theory would have been inconsistent with his alibi defense. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].) Moreover, although Rivera testified he had drunk some beer and taken two Quualudes that evening, it was ap-

parent from his overall testimony that the alcohol and drugs had no effect upon his memory of the events, his judgment or mental state in order to warrant the giving of instructions pertaining to diminished capacity due to intoxication. The trial court expressly so found and we concur. Reviewing the factual record before us, we hold the trial court correctly charged the jury on malice.

The foregoing analysis disposes of Rivera's final contention the trial court erred by refusing to instruct on assault with intent to commit voluntary manslaughter as a lesser included offense of assault with intent to commit murder or whether the former crime exists. (Compare *People* v. *Otis, supra*, 111 Cal.App.3d 467, 473-476, with *People* v. *Stevenson, supra*, 79 Cal.App.3d 976, 987.) Having concluded the evidence does not support the giving of the manslaughter instructions, it necessarily follows the evidence does not support the proffered instruction.

### Disposition

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 3, 1982.