[Crim. No. 22018. Dec. 27, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY DOUGLAS BIGELOW, Defendant and Appellant.

COUNSEL

Ira M. Feinberg, under appointment by the Supreme Court, Steven J. Roman and John V. Roos for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edmund D. McMurray and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BROUSSARD, J.**—Defendant Jerry Bigelow was convicted of the first degree murder, robbery, and kidnaping of John Cherry. The jury found that

Bigelow was armed with and used a firearm during the commission of these crimes. It further found four special circumstances under the 1978 death penalty initiative: (1) intentional murder for financial gain (Pen. Code, § 190.2, subd. (a)(1));[1] (2) murder for the purpose of avoiding arrest or perfecting an escape (§ 190.2, subd. (a)(5)); (3) murder while defendant was engaged in the commission of robbery (§ 190.2, subd. (a)(17)); and (4) murder while defendant was engaged in the commission of kidnaping (*id.*). The jury returned a verdict imposing the death penalty. Bigelow's appeal is automatic.[2]

## I. *Statement of Facts.*

We summarize the evidence presented by the People and recount the procedures leading to Bigelow's conviction. Testimony and rulings which give rise to issues on appeal will be discussed in greater detail later in the opinion.

In July of 1980 Bigelow, then age 20, was imprisoned for robbery at the Calgary Correctional Institution, a Canadian prison known as "Spy Hill." About July 18, he and Michael Ramandonovic escaped from that prison. In Calgary they met two women, Karen Keraiff and Candis Oglow, and persuaded the women to drive them to the United States. The escapees then made their way from Montana to California, committing a series of burglaries, using stolen credit cards, and siphoning gas.

On July 30, they reached Sacramento and checked into the Holiday Inn. They tried to use a stolen credit card to buy clothing at Macy's, but Ramandonovic was arrested when he attempted to pick up the clothing. Bigelow then hitchhiked to Los Angeles.

Ramandonovic phoned Karen Keraiff in Calgary, and she agreed to make arrangements for his bail. Keraiff and Oglow drove to Sacramento, where Keraiff left her car as collateral for the bail. Bigelow then returned to Sac-

---

[1]Unless otherwise noted, all citations are to the Penal Code.

[2]Bigelow filed a propria persona petition for habeas corpus seeking to dismiss the appeal. We denied the petition for habeas corpus on June 16, 1982, and at the same time denied a motion by appointed counsel to be relieved on grounds of conflict of interest.

• In *People* v. *Stanworth* (1969) 71 Cal.2d 820, 833-834 [80 Cal.Rptr. 49, 457 P.2d 889], we held that since the state has an independent interest in ensuring that the death penalty is not improperly inflicted, a defendant could not waive or dismiss the appeal. (See also *Massie* v. *Sumner* (9th Cir. 1980) 624 F.2d 72, 73, cert. den. (1983) 449 U.S. 1103 [66 L.Ed.2d 828, 101 S.Ct. 899]; *People* v. *Chadd* (1981) 28 Cal.3d 739, 752-753 [170 Cal.Rptr. 798, 621 P.2d 837]; *People* v. *Teron* (1979) 23 Cal.3d 103, 115, fn. 7 [151 Cal.Rptr. 633, 588 P.2d 773].) The same policy would preclude Bigelow from limiting the appeal to those asserted errors, if any, which might lead to outright acquittal, barring judicial consideration of errors which might result in a retrial.

ramento. On August 20, he and Ramandonovic broke into the Sacramento apartment of Robert Goodwin and stole a number of items, including a .38 caliber revolver. On August 23 they broke into John Nelson's car and stole his wallet, money and credit cards.

On August 24, Bigelow and Ramandonovic decided to hitchhike with the objective of stealing the driver's car and money. John Cherry picked them up and offered to give them a ride to Modesto. When they reached Modesto, Ramandonovic pulled out the revolver and told Cherry to take them to Los Angeles.

As the car neared Merced, Ramandonovic told Cherry to pull off the freeway so they could find a place to urinate. They drove about a mile through farmland and stopped by a cornfield. According to Bigelow, Ramandonovic told Cherry they were going to tie him up and leave him there. Bigelow went to the car to get Cherry's long pants and shirt, then returned to the car to look for something to bind Cherry when he heard a shot. Ramandonovic ran back to the car, and said, "Come on, let's go." They drove off in Cherry's car, taking Cherry's dog with them.

Ramandonovic did not testify at Bigelow's trial. Oglow, however, testified that when the men returned to Sacramento Bigelow told her that he had told the driver to lie down in a cornfield and had shot the driver in the head. Later, according to Keraiff, when the four were driving to Los Angeles in Cherry's car, Bigelow said to Ramandonovic, "I don't know why you were so upset. I'm the one that shot him, not you." Bigelow explained to the women that he "had sent Mike to the car to get rope and when he came back the guy was shot."

Bigelow, Ramandonovic, and the two women drove to Flagstaff, Arizona, where Ramandonovic decided to leave the others and departed with the dog, revolver, and half the money. Keraiff then took a bus back to Sacramento. On August 24, Bigelow and Oglow attempted to rob a grocery store in Seligman, Arizona, but were apprehended shortly after the robbery. Bigelow was driving the car stolen from Cherry. Two days later Ramandonovic was arrested for speeding in New Mexico; the arresting officer found the stolen gun and dog.

The body of John Cherry was not discovered until October 9. It was lying face down in a cornfield. An autopsy determined that the cause of death was a single bullet which entered the head above the right ear. Ballistics analysis determined that the bullet could have been fired from the .38 revolver taken from Robert Goodwin's apartment.

Bigelow and Ramandonovic were jointly charged with murder, kidnaping and robbery. The cases were soon severed and James Barnett, a Merced County Deputy Public Defender, was appointed to represent Bigelow. He moved unsuccessfully to strike the robbery and kidnaping charges and the special circumstances.

On December 5, 1980, about three months before the scheduled trial date, Bigelow told the court he was not satisfied with appointed counsel, and requested new counsel. The court rejected the request, affirming its confidence in Barnett.

Trial was continued until March 24, 1981. On March 20, Bigelow again requested new counsel. The court reaffirmed its confidence in Barnett and denied the request as untimely.

On March 23, after his efforts to replace Barnett with other appointed counsel failed, Bigelow inquired whether he could represent himself, and asked the court, "Your Honor, in a capital case like mine is there—would I be able to defend myself with a public defender as an advisor?" The court replied, "No, you can't do that, and I certainly don't think you should even think about defending yourself. But we will take that up in the morning, Mr. Bigelow."

The next morning, the court returned to the subject and asked, "Now, Mr. Bigelow, are you still insisting that you be your own attorney?" Bigelow replied, "In a sense where I could use maybe a public representative as an advisor." The court promptly rejected that suggestion, saying, "That's not permitted under California law."

Although disappointed at the court's refusal to consider an attorney advisor, Bigelow continued to assert his right to represent himself. The trial court then questioned Bigelow at length about his knowledge of legal procedures and his understanding of the dangers of representing himself. Dissatisfied by Bigelow's answers to his inquiry, the judge initially concluded that Bigelow was not competent to waive counsel.

After the lunch recess, however, the judge inquired whether Bigelow still wanted to represent himself. When Bigelow said "yes," the judge responded: "All right. You're going to represent yourself. . . . I'm going to give

him a tablet and a pencil, and we're going to start in right away." The voir dire of the jury followed immediately.[3]

Bigelow participated ineffectually in the process of selecting the jury, and briefly cross-examined some of the prosecution witnesses. He called only one defense witness, the detective who heard his confession, and used him to establish that the confession was not taken under oath. The court denied Bigelow's motion to exclude the confession on that ground.

The jury returned a special verdict finding Bigelow guilty of murder in the first degree, that the murder was a willful deliberate and premeditated murder with malice aforethought, that it occurred during the commission of robbery, and during the commission of kidnaping. The jury further found that he was armed with and used a firearm during the commission of the murder. Finally, the jury found each of the charged special circumstances to be true: (1) that Bigelow "was personally present and physically aided or committed the acts causing the death of [the victim] and . . . murdered [the victim] intentionally and carried it out for financial gain";[4] (2) that he "committed the murder for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt to perfect an escape from lawful custody"; (3) that he committed the murder while "engaged in or . . . an accomplice in the commission of . . . robbery; and (4) that he committed the murder while "engaged in or . . . an accomplice in the commission of kidnapping, a violation of Section 207 of the . . . Penal Code."

At the penalty trial, the prosecution called no witnesses and presented only the record proving Bigelow's robbery conviction in Canada. Bigelow called his sister and brother[5] to testify that he had been rejected and regularly beaten by his father, had begun to use drugs as a teenager, and had attempted several times to kill himself by a drug overdose.

---

[3]Although Bigelow did not expressly request a continuance to prepare for trial, such a request might have been futile since the trial judge, while questioning Bigelow to determine his competency to waive counsel, repeatedly stated that he would not permit a continuance. In *People* v. *Moss* (1967) 253 Cal.App.2d 248 [61 Cal.Rptr. 107], the Court of Appeal held that a failure to grant a continuance under similar circumstances was a denial of due process.

We agree with defendant that he could not reasonably be expected to proceed to trial without any time for preparation, and that if the trial court did not intend to deny the motion for self-representation as untimely under *People* v. *Windham* (1977) 19 Cal.3d 121 [137 Cal.Rptr. 8, 560 P.2d 1187], it should have considered granting a continuance. Since we reverse the conviction on other grounds, we do not discuss whether the court's action constituted reversible error.

[4]The requirement of physical presence, and aiding or committing "the acts causing death" was part of the 1977 death penalty legislation (see former § 190.2, subd. (c)), but was not included in the 1978 act under which defendant was prosecuted.

[5]Barnett, although dismissed by Bigelow, assisted him in arranging for his sister and brother to come from Canada to testify.

The jury returned a verdict imposing the death penalty. The trial court denied Bigelow's motion to reduce the penalty. This appeal followed.

II. *The Trial Court's Failure to Consider the Appointment of Advisory Counsel Is Reversible Error.*

■ The People concede that the trial judge erred in ruling that California law does not permit the appointment of advisory counsel. In *People* v. *Mattson* (1954) 51 Cal.2d 777 [336 P.2d 937], this court, after holding that a defendant was not entitled both to counsel and to represent himself, added: "We are not saying that the trial court may not in its discretion, upon what it may determine to be good cause shown, . . . permit a defendant who appears *in propria persona* to employ an attorney to sit by him and advise him during the presentation of the case in court, or even appoint an attorney (with the latter's consent) to render such advisory services to an indigent defendant who wishes to represent himself. . . . These matters are within the sound discretion of the trial judge, who is in a position to appraise the courtroom situation and determine what procedure will best promote orderly, prompt and just disposition of the cause." (P. 797.)

California courts have frequently exercised their discretion to appoint advisory counsel. (See, e.g., *People* v. *Linden* (1959) 52 Cal.2d 1, 15 [338 P.2d 397]; *People* v. *Bourland* (1966) 247 Cal.App.2d 76, 86 [55 Cal.Rptr. 357]; compare *Ligda* v. *Superior Court* (1970) 5 Cal.App.3d 811, 826 [85 Cal.Rptr. 744], which upheld an order directing a public defender to serve as advisory counsel, with *Chaleff* v. *Superior Court* (1977) 69 Cal.App.3d 721, 725 [138 Cal.Rptr. 735] which held a public defender was not in contempt for refusing to so serve.)

The federal courts also endorse the appointment of advisory counsel. In *Mayberry* v. *Pennsylvania* (1971) 400 U.S. 455, 467 [27 L.Ed.2d 532, 541, 91 S.Ct. 499], Chief Justice Burger in a concurring opinion commended "the wisdom of the trial judge in having counsel remain in the case even in the limited role of a consultant." Four years later, when in *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], the Supreme Court established the constitutional right of a defendant to represent himself, it carefully added that: "Of course, a State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary." (P. 835, fn. 46 [45 L.Ed.2d at p. 581].)[6] *Faretta* cited *United*

---

[6]We reject the argument presented in the dissenting opinion of Justice Hanson in *Chaleff* v. *Superior Court, supra,* 69 Cal.App.3d 721, 725 that a California court's power to appoint advisory counsel did not survive the decision of the United States Supreme Court in *Farretta*.

States v. *Dougherty* (D.C.Cir. 1972) 473 F.2d 1113, 1125, in which the court recommended the "appointment of an amicus curiae to assist the defendant"; *Dougherty* in turn cited *United States* v. *Spencer* (2d Cir. 1971) 439 F.2d 1047, 1051, which recommended offering defendant "the assistance of appointed counsel available as a resource to the extent that the defendant may wish to make use of his services."

■ Mistakenly believing it had no authority to appoint advisory counsel, the trial court failed to exercise its discretion. That failure, in itself serious error, gains in significance because on the record in this case it would have been an abuse of discretion to deny the request for advisory counsel.

This is a capital case. Such cases raise complex additional legal and factual issues beyond those raised in an ordinary felony trial. (See *Keenan* v. *Superior Court* (1982) 31 Cal.3d 424, 432 [180 Cal.Rptr. 489, 640 P.2d 108].) Accordingly the Legislature has enacted special legislation providing for the appointment of counsel (§ 987) and the hiring of investigators (§ 987.9) in capital cases. We construed that legislation in *Keenan* to permit the appointment of two counsel in a capital defense, noting that the difficulty of preparing for trial "was compounded . . . by the inherent problem present in any capital case of simultaneous preparation for a guilt and a penalty phase of the trial." (31 Cal.3d at p. 432.)[7]

The present case, moreover, presented especially difficult problems. The case arose under the 1978 death penalty initiative, an enactment rife with constructional and constitutional difficulties, which had not yet been judicially interpreted. Bigelow was charged with four special circumstances. Two of these circumstances—murder for financial gain, and murder to perfect an escape, had never been judicially construed, and might arguably be inapplicable to defendant's act. The other two circumstances—felony murder based on kidnaping and robbery—raised the then unsettled question whether intent to kill was an essential element of the special circumstance. (See *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862].)

The defendant facing trial in this complex capital case had only a ninth grade education. A Canadian, he was unfamiliar with California law and did not, for example, know whether and on what grounds a prospective

---

[7]The capital nature of the case also affects the standard by which the court should evaluate Bigelow's request. As we explained in *Keenan* v. *Superior Court, supra,* 31 Cal.3d 424, 430: "The United States Supreme Court has expressly recognized that death is a different kind of punishment from any other, both in terms of severity and finality. Because life is at stake, courts must be particularly sensitive to insure that every safeguard designed to guarantee defendant a full defense be observed."

juror could be challenged. Although he had been in court on several occasions, he had been represented by counsel on each occasion except once when he pled guilty to a minor offense. After extensive questioning, the trial judge told Bigelow that "I'm going to have to insist that Mr. Barnett continue to represent you. You just don't know enough about the law. . . . [Y]ou seem to be a nice young fellow to me, and I don't want you hanging yourself." Although the court later realized that Bigelow's lack of legal knowledge did not prevent him from making an intelligent waiver of counsel, the court's initial conclusion that he was not competent to defend a capital case is unquestionably true.

Under these circumstances we have no doubt that the trial court, had it realized it could appoint advisory counsel, would have exercised its discretion to do so. Had the court refused, we would find that action an abuse of discretion.

■■■ The question remains whether the failure of the trial court to exercise its discretion and to appoint advisory counsel is reversible error. The Attorney General argues that it is not, pointing out that the trial judge from time to time offered Bigelow advice and assistance, and that Barnett helped Bigelow arrange for his brother and sister to appear as witnesses. On the other hand, no one explained to him how to select a jury in a capital case, how to object to the evidence of other crimes offered by the prosecution at the guilt phase (evidence which, as explained later in this opinion, should not have been admitted), or how to attack the special circumstance allegations.

When the right to counsel is at stake courts generally do not attempt to assess prejudice by speculating as to what tactics could have been employed, or what objections raised, by a better represented or advised defendant. ■■■ The denial of the right to appointed counsel is prejudicial per se. (*Holloway* v. *Arkansas* (1978) 435 U.S. 475, 489 [55 L.Ed.2d 426, 437, 98 S.Ct. 1173].) ■■■ The erroneous denial of the right of self-representation is also reversible error. (*People* v. *Joseph* (1983) 34 Cal.3d 936, 946-948 [196 Cal.Rptr. 339, 671 P.2d 843] and cases there cited.) ■■■ No cases have defined the test of prejudice for failure to exercise discretion concerning the appointment of advisory counsel, but when as here a refusal to so appoint would be an abuse of discretion, we believe the same rule of per se reversal should apply.

Some decisions justify a rule of automatic reversal by emphasizing the fundamental character of the right to counsel. (E.g., *Holloway* v. *Arkansas, supra,* 435 U.S. 475, 489 [55 L.Ed.2d 426, 437].) That rationale is inapplicable to the present case, for Bigelow had no absolute right to advisory

counsel (see *People* v. *Mattson, supra,* 51 Cal.2d 777, 795-796), but only to a considered exercise of judicial discretion. A second reason for a rule of per se reversal, however, applies fully in the present setting: the impossibility of assessing the effect of the absence of counsel upon the presentation of the case.

Judicial opinions on analogous issues explain this latter reason. In *People* v. *Joseph, supra,* 34 Cal.3d 936, we held that a wrongful denial of the right of self-representation was prejudicial per se, noting that "an assessment of why or how an accused's trial was disadvantaged by injecting an undesired attorney would require an impossibly speculative comparison between the accused's undisclosed *pro se* strategy and that of counsel." (P. 946.) In *In re William F.* (1974) 11 Cal.3d 249 [113 Cal.Rptr. 170, 520 P.2d 986], we held that denial of a defendant's right to have counsel present at closing argument was reversible per se, stating that "[t]he compelling reason for the rule of prejudice per se is that no realistic measure of prejudice resulting from counsel's nonparticipation can be made when, because of the very absence thereof, the record fails to reflect what different direction the proceedings might have taken and what different results might have obtained." (P. 256.) Similarly in *People* v. *Hosner* (1975) 15 Cal.3d 60 [123 Cal.Rptr. 381, 538 P.2d 1141], we held that failure to furnish a retried defendant with a free transcript of a prior trial was automatically reversible: "The denial of the transcript does not merely taint some specific items of evidence, leaving other items which might of their own force provide overwhelming evidence of guilt beyond a reasonable doubt. Rather, *in the manner of the denial of the assistance of counsel,* the denial of a transcript of a former trial infects all the evidence offered at the latter trial, for there is no way of knowing to what extent adroit counsel assisted by the transcript . . . might have been able to impeach or rebut any given item of evidence." (P. 70, italics added.)

The present case is also one in which an appellate court has no way to measure the prejudicial effect of error. What we know from the record is that Bigelow, representing himself, proved totally incompetent as a defense attorney, and that this trial of a capital case could rightly be described as a "'farce or a sham.'" (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) What we do not know is whether Bigelow, aided by advisory counsel, would have done any better. The most we could do would be to identify points in the trial where competent counsel might have advised Bigelow to do something different, wonder whether Bigelow would follow the advice, and speculate about the impact of the advice on the outcome of the trial. Even that effort would not disclose the possibility that counsel might advise Bigelow to seek out evidence and witnesses which do not appear in the present record. Trying to assess prejudice in this setting

would amount to "speculation running riot." (*People* v. *Hosner, supra,* 15 Cal.3d 60, 70.) A rule of per se reversal is the only way to protect the right of defendant to a conscientious exercise of judicial discretion on the appointment of advisory counsel, and to vindicate the state's independent interest in the fairness and accuracy of a capital proceeding. (*People* v. *Chadd, supra,* 28 Cal.3d 739, 752-753.)

III. *Other Issues Relating to Trial of Guilt and Special Circumstances.*

(A) *Evidence of Uncharged Crimes.*

Detailing Bigelow's criminal career from his escape in Canada in July of 1980 to his arrest in Arizona on August 29 of that year, the prosecution presented proof of his participation in the following criminal acts:

(1) Escape from custody at a Canadian penal institution.

(2) Burglaries committed in Calgary, Alberta.

(3) Burglaries, theft of a truck and the illegal use of stolen credit cards as defendant and Ramandonovic made their way from Montana to California.

(4) The attempted use of a stolen credit card to purchase clothes at Macy's in Sacramento.

(5) The burglary of the home of Robert Goodwin in Sacramento, where defendant obtained the gun used to kill Cherry.

(6) The theft of credit cards from John Nelson's car parked near Sacramento.

(7) The robbery of a dry cleaning store in Sacramento.

(8) Burglaries in Arizona.

(9) The robbery by Bigelow and Oglow of a grocery store in Seligman, Arizona.

Defense counsel contends that all of this evidence was inadmissible and highly prejudicial. The latter point needs no elaboration; proof that the charged crimes were not an isolated act, but part of a series of more than a dozen crimes committed by two escaped convicts could not help but have an impact on the jury.

The Attorney General points out that Bigelow objected only to evidence of the Arizona robbery, not to evidence of any of the other crimes. Even the objection to the Arizona robbery, he claims, came too late because Bigelow did not object to the admissibility of the confession in which he admitted that crime, but only when the prosecutor offered independent evidence of the offense. By failing to raise a timely objection, he concludes, Bigelow waived his right to present the issue on appeal. (See *People* v. *Harris* (1978) 85 Cal.App.3d 954, 957 [149 Cal.Rptr. 860].)

Because we reverse the conviction on other grounds, we need not determine whether the present case falls within any exception to the rule that failure to object waives issues of admissibility. We nevertheless discuss the admissibility of the evidence of uncharged crimes because our conclusion—that the evidence was inadmissible—highlights the prejudice suffered by defendant from having to try the case without an attorney as an advisor, and will avoid repetition of the error on retrial.

The admissibility of evidence of other crimes is governed by Evidence Code section 1101. Subdivision (a) provides in relevant part that "evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct), is inadmissible when offered to prove his conduct on a specified occasion." Subdivision (b) states the exception to this rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime . . . when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident) other than his disposition to commit such acts."

Construing this statute, *People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883], set out three requirements which must be met before evidence of other crimes is admitted: the evidence must be relevant to some material fact at issue; it must have a tendency to prove that fact; and admissibility must not contravene policies limiting its admission. The latter requirement takes account of policies barring evidence which tends to prove guilt by proving disposition to commit crime, those barring use of prejudicial cumulative evidence, and the statutory provision (Evid. Code, § 352) permitting exclusion of evidence when its probative value is outweighed by its prejudicial effect.

Much of the evidence of other crimes fails to meet the test of admissibility at each step in the analysis. The prosecution's primary theory of relevance was that defendant committed each of these crimes to finance and perpetuate an escape from custody, which allegedly is relevant to the charged special circumstance of murder "to perfect an escape from lawful custody"

(§ 190.2, subd. (a)(5)). ■ If evidence relevant only to a special circumstance is introduced at the guilt trial, however, it should be accompanied by a jury instruction limiting its use. When that evidence is highly prejudicial, the court should exclude it at the guilt trial and conduct a separate trial of the special circumstance allegations.[8] The introduction of extensive evidence of criminal activity at the guilt phase without limitation as to use cannot be defended on the ground that the evidence might be relevant to a special circumstance.

■ The Attorney General also argues that the evidence of other crimes is relevant to defendant's guilt because it proves Bigelow's motive in the robbery, kidnaping and murder of Cherry was to obtain Cherry's property. This point was not seriously contested; there was no question but that, whoever shot Cherry, the robbery, kidnaping and murder were done as part of a plan to steal Cherry's car. Indeed, the motive for robbery is generally one of acquiring the victim's property, and proof that Bigelow previously committed theft or robbery for this purpose adds little to the case. The assertion that Bigelow and Ramandonovic were escapees, and wanted the property to use or spend while they remained at large, is immaterial to defendant's guilt. In sum, the evidence of other crimes, if admitted to prove Bigelow's motive for the charged crimes, is highly prejudicial, yet has only marginal relevance to a fact (motive) which was not seriously contested, and has virtually no tendency to prove that fact.

■ The Attorney General also argues that two of the crimes—the robbery of a drycleaner in Sacramento and the robbery of a grocery store in Seligman, Arizona—were relevant to prove that Bigelow and not Ramandonovic was the man who actually shot Cherry. This, at least, is an arguably material issue of importance, even though Bigelow might be guilty of murder as an accomplice even if Ramandonovic was the triggerman. The Attorney General's theory as to how those two uncharged offenses prove Bigelow shot Cherry, however, is logically and legally unsound.

In the Sacramento robbery Bigelow and Ramandonovic entered a drycleaning shop. Bigelow ordered the clerk at gunpoint to go into the back room and lie down while Ramandonovic took money from the cash register. In the Arizona case Bigelow and Oglow entered a grocery store. Bigelow, armed with a knife, ordered the clerk to go into the back room and lie down; he and Oglow then took the money. From these two instances, the

---

[8]In *People* v. *Velasquez* (1980) 26 Cal.3d 425 [162 Cal.Rptr. 306, 606 P.2d 341], one charged special circumstance was that defendant had been previously convicted of murder, a matter inadmissible at the guilt trial. The court accordingly divided the trial into three parts, with a special circumstance proceeding following the trial of guilt but preceding the penalty trial. (See 26 Cal.3d at p. 432.)

Attorney General draws the inference that it was Bigelow who held the gun, ordered Cherry to lie down, and shot him.

This argument is essentially the familiar one of proving identity by proof of modus operandi (see generally *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91]), although unlike most cases involving such proof the issue is not whether defendant was one of the perpetrators but whether he was the triggerman. The admissibility of evidence on this theory depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267].)

The only common marks here are the presence of Bigelow as one of the robbers and the fact that the victim was ordered to lie down. The first mark is immaterial since Bigelow's presence is not part of any modus operandi; the second is not sufficiently distinctive to justify admissibility. (See *People* v. *Haston, supra,* 69 Cal.2d 233, 247-248.) Moreover, the significance of any common marks is overcome by the differences between the charged and uncharged crimes. Both uncharged robberies involved entry into a business establishment to steal cash; the present case began as a taking of a car by two persons posing as hitchhikers. And more significantly, in both uncharged robberies the victim was unharmed, even though in one case she refused to obey an order to lie down. (As defense counsel point out, one could as readily infer from the prosecution evidence that whenever Bigelow holds the weapon, the victim escapes without injury.) We conclude that the evidence of the Sacramento and Arizona robberies was not admissible to prove that Bigelow shot Cherry.

(B) *Instructions on Liability of an Accomplice.*

The trial court instructed the jury in the language of CALJIC No. 3.01, which explained which persons are liable as aiders and abettors of a crime. That instruction read: "A person aids and abets the commission of a crime if, with knowledge of the unlawful purpose of the perpetrator of the crime, he aids, promotes, encourages or instigates by act or advice the commission of such crime." In *People* v. *Beeman* (1984) 35 Cal.3d 547 [199 Cal.Rptr. 60, 674 P.2d 1318], we held CALJIC No. 3.01 erroneous because it failed to require that the person not only know the criminal purpose of the perpetrator but also act "with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (P. 560.) At retrial the court should instruct the jury in accord with the *Beeman* decision.[9]

---

[9]The instructions on aiding and abetting are significant, since the jury could reasonably construe defendant's confession as a tacit admission that he knew Ramandonovic intended to kill Cherry, but did not share that intent. If such was defendant's state of mind, he would be guilty as an aider and abettor under the 3.01 definition, but not under the standard established in *Beeman*.

(C) *Instructions on First Degree Murder.*

The trial court erroneously instructed the jury that murder perpetrated during the commission of a kidnaping is first degree murder. Section 189, the felony-murder statute, classifies as first degree murder a killing "which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288 [lewd or lascivious acts with a child under 14]." Kidnaping is not listed in section 189.

(D) *The Special Circumstance of Murder for Financial Gain.*

The 1977 death penalty law included a special circumstance of murder for hire, defined in the following language: "The murder was intentional and was carried out pursuant to an agreement by the person who committed the murder to accept valuable consideration for the act of murder from any person other than the victim." (Former § 190.2, subd. (a).) As was frequently the case, the 1978 initiative replaced the precise language of the 1977 act with vague and broad generalities.[10] In this instance, it rewrote the special circumstance to read: "The murder was intentional and carried out for financial gain." (§ 190.2, subd. (a)(1).) The trial court instructed the jury in the statutory language.

Read broadly, the 1978 language would create a large area of overlap between this special circumstance and that of felony murder (§ 190.2, subd. (a)(17)), since most robberies, as well as many burglaries, kidnapings and arsons, are committed for financial gain.

Defense counsel maintains that although the 1978 law expanded the scope of the special circumstance beyond murder for hire,[11] it should still be limited to those cases in which the victim's death is essential to obtaining the financial gain, such as a killing to obtain an inheritance or life insurance proceeds. Defendant cites a decision of the Nebraska Supreme Court construing an aggravating factor of "murder for pecuniary gain" to apply (1) to the hired gun, (2) to the hirers of the gun, and (3) to murder motivated

[10]See discussion in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 144-145 [199 Cal.Rptr. 60, 674 P.2d 1318], of the felony-murder special circumstance of the 1978 law (§ 190.2, subd. (a)(17)).

[11]Under the 1977 law, the hirer of a paid killer was subject to the murder for hire special circumstance. Under the 1978 law, he is not directly subject to the special circumstance unless he was motivated by financial gain, but is subject to a special circumstance finding as one "found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder . . . in any case in which . . . the special circumstances enumerated in paragraphs (1) . . . [is] specially found . . . to be true." (§ 190.2, subd. (b).)

primarily by a desire for pecuniary gain as in the case of a murder of an insured by the beneficiary of a life insurance policy for the purpose of obtaining the proceeds, or the murder of a testator of a legatee or devisee to secure a legacy or a devise." The Nebraska court concluded that "here . . . we do not consider the murder was committed for a pecuniary gain even though the result could possibly have been to enable [defendant] to keep the proceeds of the robbery. We think it is not reasonable to construe the definitions in such a manner as to make them overlap and make the same identical facts constitute two aggravating circumstances." (*State* v. *Rust* (1977) 197 Neb. 528 [250 N.W.2d 867, 874].)[12]

We write with little to guide us in the construction of the financial gain special circumstance. No legislative history illumines the adoption of this special circumstance. The ballot arguments and other materials concerning the 1978 initiative do not address the subject.

■ In this context, we believe the court should construe special circumstance provisions to minimize those cases in which multiple circumstances will apply to the same conduct, thereby reducing the risk that multiple findings on special circumstances will prejudice the defendant. Such a limiting construction will not prejudice the prosecution, since there will remain at least one special circumstance—either financial gain or felony murder—applicable in virtually all cases in which the defendant killed to obtain money or other property. We adopt a limiting construction under which the financial gain special circumstance applies only when the victim's death is the consideration for, or an essential prerequisite to, the financial gain sought by the defendant. Since the present case does not fall within the special circumstance as so limited, the trial court erred in submitting that special circumstance to the jury.

(E) *The Special Circumstance of Murder to Avoid Arrest or Perfect an Escape.*

The 1978 initiative added a new special circumstance of murder committed "for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt to perfect an escape from lawful custody." (§ 190.2, subd. (a)(5).) The jury, instructed in the words of the statute without explanation of its terms, found the special circumstance to be true.

---

[12]Two other decisions have similarly narrowed a murder for pecuniary gain factor to avoid overlap with felony murder. (*Cook* v. *State* (Ala. 1979) 369 So.2d 1251, 1256; *Provence* v. *State* (Fla. 1976) 337 So.2d 783, cert. den. (1977) 431 U.S. 969 [53 L.Ed.2d 1065, 97 S.Ct. 2929].) Contrary decisions include *Smith* v. *State* (Miss. 1982) 419 So.2d 563, certiorari denied (1983) 460 U.S. 1047 [75 L.Ed.2d 803, 103 S.Ct. 1449]; *State* v. *Oliver* (N.C. 1981) 302 N.C. 28 [274 S.E.2d 183].

 We find no evidence in the record that Cherry was murdered to avoid or prevent a lawful arrest. At the time of the killing Bigelow and Ramandonovic were not under arrest and were not threatened with imminent arrest. Although the prosecutor surmised that Cherry was killed so that he would not report the robbery and kidnaping—a report which might eventually lead to the men's arrest—this argument is totally speculative. It is also an unreasonably expansive reading of the special circumstance of avoiding arrest, a reading which would cause that circumstance to overlap extensively with felony murder.[13] We believe the special circumstance of avoiding arrest should be limited to cases in which the arrest is imminent.

The only evidence that Cherry was killed to "perfect an escape" is Bigelow's response to leading questions put by Detective Harris:

"MR. HARRIS: Now when you guys left Spy Hill, you knew you were running from the law at that time; didn't you?

"THE DEFENDANT: Yeah.

"MR. HARRIS: Uh-huh. And you used this stealing the car and this whole thing just to keep from getting caught; is that correct?

"THE DEFENDANT: Yeah.

"MR. HARRIS: Uh-huh. And you kept running to keep from getting caught, and you kept pulling crimes; is that it?

"THE DEFENDANT: Yeah."

 Despite this evidence, we believe that Cherry's murder as a matter of law cannot be considered one committed to perfect an escape. This special circumstance logically requires that the murder occur before the escape has been perfected, when the act of escaping is still in progress. In the present case, Bigelow and Ramandonovic had completed their escape long before the Cherry murder.

---

[13]The 10th special circumstance in the 1978 law is the killing of a witness to prevent his testimony. This circumstance applies only if "the killing was not committed during the commission, or attempted commission of the crime to which he was a witness." (§ 190.2, subd. (a)(10).) The qualifying language avoids applying the 10th circumstance to cases in which the defendant kills the victim of a robbery or other crime to prevent him from testifying to that crime.

The prosecutor's reading of the fifth special circumstance (avoiding arrest) would nullify that qualifying language. Under that theory, all the prosecutor would have to do is to claim that the victim was killed not only to prevent him from testifying in court but also to prevent him from reporting the crime to the police, and the result would be to extend the avoiding arrest circumstance to virtually all felony murders.

 Defendant cites cases which suggest that an escape is "perfected" as soon as the inmate has left the physical confines of the prison. (See *People* v. *Guevara* (1979) 88 Cal.App.3d 86, 90 [151 Cal.Rptr. 511]; *People* v. *Bailey* (1974) 38 Cal.App.3d 693, 701 [113 Cal.Rptr. 514]; *People* v. *Fain* (1971) 18 Cal.App.3d 137, 145 [95 Cal.Rptr. 562].) Other cases hold that it is only necessary that the defendant leave the portion of the prison where he is confined; thus, in *People* v. *Temple* (1962) 203 Cal.App.2d 654, 658 [21 Cal.Rptr. 633], the court approved a jury instruction that " '[a]n escape is the unlawful departure of a prisoner from the limits of his custody even though he did not leave the prison property.' "

The cited cases consider whether a defendant can be separately sentenced for escape and crimes committed during an escape, and how to distinguish escape from attempted escape. They do not provide a satisfactory definition of the duration of escape for the purpose of the special circumstance in the 1978 initiative. We are confident that the special circumstance of murder "to perfect an escape" was intended to apply to an inmate who kills while breaking out of a prison, even though he has already escaped from his cell; it should likewise apply to an inmate who kills during hot pursuit after departing the prison confines. The limiting language suggested by defendant's cases would exclude such murders on the ground that the defendant had already left the portion of the prison to which he was legally confined.

The broad test suggested by the Attorney General is equally unsatisfactory. Under his concept of "once an escapee, always an escapee," a murder 20 years after an escape would fall within the special circumstance if motivated in part by a desire to avoid returning to custody. Under this reasoning, an escape could never be "perfected," a view which is inconsistent with the statutory language.

We adopt a middle position, drawing upon the test used in felony-murder cases to determine when a killing is so closely related to an underlying felony as to justify an enhanced punishment for the killing. Under this test, even though every element of a crime has been fulfilled (and thus in a sense, the crime has been "perfected"), the crime continues until the criminal has reached a place of temporary safety.

In the case of robbery, for example, the crime is committed—as distinct from a mere attempt—when the defendant removes the victim's property. (See *People* v. *Gibbs* (1970) 12 Cal.App.3d 526, 548 [90 Cal.Rptr. 866]; *People* v. *Green* (1979) 95 Cal.App.3d 991 [157 Cal.Rptr. 520].) The robbery continues, however, until the robber has escaped with his loot to a place of temporary safety. (See *People* v. *Fields* (1983) 35 Cal.3d 329, 365-367 [197 Cal.Rptr. 803, 673 P.2d 680]; *People* v. *Salas* (1972) 7 Cal.3d

812, 824 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832]; *People* v. *Laursen* (1972) 8 Cal.3d 192, 199-200 [104 Cal.Rptr. 425, 501 P.2d 1145]; *People* v. *Powell* (1974) 40 Cal.App.3d 107, 164 [115 Cal.Rptr. 109].) Once the defendant has reached a place of temporary safety, the robbery is at an end. (See *People* v. *Ford* (1966) 65 Cal.2d 41, 57 [52 Cal.Rptr. 228, 416 P.2d 132].)

 We adopt the same standard for the special circumstance of murder to "perfect an escape." To come within this standard, the killing must not only be motivated by the goal of escaping custody, but must take place before the defendant has departed the confines of the prison facility and reached a place of temporary safety outside the confines of the prison. Upon reaching a place of temporary safety, the escape is "perfected" within the meaning of the statutory language, and the special circumstance is inapplicable to any subsequent killing.

 Under this standard, it is plain that the special circumstance is inapplicable to the murder of John Cherry. When defendant reached Sacramento on July 30, 1980, he had remained at liberty for twelve days after his escape, and traveled across an international boundary to a destination over a thousand miles from his place of confinement. No hot pursuit was underway. Here, if not earlier, he had reached a place of temporary safety, and for the moment made good his escape. The court therefore erred in submitting this special circumstance to the jury, and the verdict finding the murder was committed for the purpose of avoiding arrest or perfecting an escape is not supported by substantial evidence.

(F) *The Special Circumstance of Murder During the Commission of Robbery.*

After finding defendant guilty of robbery, the jury further found that he murdered Cherry while engaged, or an accomplice, in the commission of robbery. In *Carlos* v. *Superior Court, supra,* 35 Cal.3d 131, we held that proof of intent to kill or to aid a killing was essential to the finding of a felony-murder special circumstance under the 1978 initiative. On retrial the jury should be so instructed.

(G) *The Special Circumstance of Murder During the Commission of Kidnaping.*

The finding of a felony-murder special circumstance based on kidnaping is also flawed by the absence of an instruction on the element of intent to kill or to aid a killing.

 Defendant additionally contends that the court erred in failing to instruct the jury that the prosecution must prove that the murder occurred during the commission of *both* kidnaping as defined in section 207 and kidnaping as defined in section 209.[14] He points out that the 1977 death penalty law provided a special circumstance for a murder during the commission or attempted commission of several enumerated felonies, including "[k]idnapping in violation of Section 207 *or* 209 . . . ." (Former § 190.2, subd. (c)(3), italics added.) The 1978 law changed the language to the conjunctive, specifying "[k]idnapping in violation of Sections 207 *and* 209." (§ 190.2, subd. (a)(17), italics added.) This change in the statutory language, he maintains, requires proof of a violation of both section 207 and 209 as a basis for the special circumstance.

The Court of Appeal addressed this issue in *Talamantez v. Superior Court* (1981) 122 Cal.App.3d 629, 639 [176 Cal.Rptr. 800], and resolved that: "The more reasonable statutory construction is that either form of kidnap suffices for invocation of the extreme penalty. Looking at subparagraph (17) of section 190.2, subdivision (a), as a whole, it is a conjunctive enumeration of the various crimes which, if accompanied by murder, may result in the death penalty being applied. The separate enumeration of section 207 and section 209 in subsection (ii) of (17) can thus be reasonably seen as two of these enumerated offenses, also listed conjunctively, but grouped together within one subsection because of their close relationship. Thus, just as both robbery (i) and rape (iii) are individually sufficient, and both are not required, so also are simple kidnap or kidnap for robbery (both in (ii)) each individually sufficient for the statutory purpose."

As the Court of Appeal explained in *People v. Horn* (1984) 158 Cal.App.3d 1014, 1027-1028 [205 Cal.Rptr. 119], the word "and" is often carelessly used when "or" is intended. We think that type of error occurred in the drafting of subparagraph (17), and that the intent of the provision was to permit a special circumstance finding if the defendant was convicted of kidnaping under either section 207 or 209, and found to have committed murder while engaged in such kidnaping. Therefore, adopting the construction of the kidnaping special circumstance advanced in *Talamantez,* we reject defendant's contention that the court erred in not requiring proof of a

---

[14]Section 207 prohibits forcibly taking a person and carrying him into another county, state, or country, or into another part of the same county. Section 209 prohibits kidnaping for ransom, reward, or extortion (subd. (a)), as well as kidnaping to commit robbery (subd. (b)). Simple kidnaping (§ 207) has been held a lesser included offense in kidnaping to commit robbery (*People v. Bailey, supra,* 38 Cal.App.3d 693, 699; *People v. Gallagher* (1958) 164 Cal.App.2d 414, 419 [330 P.2d 464]), but not in kidnaping for ransom, reward, or extortion, since asportation is not essential to that crime (see *People v. Macinnes* (1973) 30 Cal.App.3d 838, 843-844 [106 Cal.Rptr. 589]; *People v. Anderson* (1979) 97 Cal.App.3d 419, 424 [158 Cal.Rptr. 727]).

violation of both section 207 and section 209. As noted earlier, however, the court did err in failing to instruct that the kidnaping special circumstance requires proof that defendant intended to kill or to aid in a killing.

The judgment is reversed.

Mosk, J., Reynoso, J., and Grodin, J., concurred.

Lucas, J., concurred in the judgment only.

**KAUS, J.**—I concur in the judgment and in all of the reasoning of the majority opinion with one exception. While I agree that the trial court's failure to appoint advisory counsel was prejudicial in this case, I would reserve judgment on the question whether such error is prejudicial per se. This situation appears distinguishable from the precedents on which the majority relies, both because the right to advisory counsel is not of constitutional origin and because an advisory counsel, by definition, plays a subordinate, auxiliary role in the conduct of the defense. Unlike deprivation of the right to counsel or the right to self-representation, denial of advisory counsel does not completely eviscerate a defendant's constitutionally guaranteed means of defending a criminal charge.

Although it may be that such an error will frequently prove prejudicial, it is at least theoretically possible that a defendant who chooses to represent himself will conduct a faultless defense, or that the defense that the defendant has insisted on presenting—perhaps over the advice of numerous attorneys—will have had absolutely no hope of prevailing under any circumstances, no matter how able or ingenious advisory counsel may have been. Further while we may not be able to tell from the record on appeal whether advisory counsel would have suggested additional witnesses or evidence, when no obvious prejudice appears it may not be unfair to require defendant to provide some indication of actual harm in a habeas proceeding.

Rather than attempt to anticipate and prejudge future cases, I would rest the reversal in this case on the obvious actual prejudice that resulted here from the trial court's denial of advisory counsel.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately to articulate my concern about the treatment of other-crimes evidence which is inadmissible on guilt but admissible on a special circumstance allegation. With all due respect, how will justice be served by permitting a guilt-phase jury to consider inadmissible evidence on the assumption that the jury will follow the court's instruction to put it out of mind in the guilt phase only to res-

urrect it for consideration of the special circumstance allegation? What a Herculean task!

Further, the majority's interpretation of the kidnaping-murder special circumstance (Pen. Code, § 190.2, subd. (a)(17)(ii))[1] is questionable. In spite of the unambiguous 1978 amendment to that statute requiring proof of both simple *and* aggravated kidnaping, the majority read the statute to make proof of either simple *or* aggravated kidnaping sufficient to render an accused eligible for the death penalty. Rewriting clear and unambiguous statutes, I submit, is not a proper role for this court.

## I.

The majority promulgate a new rule that evidence "relevant only to a special circumstance should be accompanied by a jury instruction limiting its use." If the evidence is "highly prejudicial," the trial courts are to "exclude it at the guilt trial and conduct a separate trial of the special circumstance allegations." (Maj. opn., *ante,* at p. 748, fn. omitted.)

I respectfully dissent from this procedure. Why should a jury be asked to consider *in*admissible evidence? A simple and straightforward rule requiring the bifurcation of the guilt and special circumstance phases of the trial would cure the problem.

In the past, this court has recognized that "[t]he admission of any evidence that involves crimes other than those for which a defendant is being tried has a 'highly inflammatory and prejudicial effect' on the trier of fact." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 314, fn. omitted [165 Cal.Rptr. 289, 611 P.2d 883].) Such evidence "is to be received with 'extreme caution,' and all doubts about its connection to the crime charged must be resolved in the accused's favor." (*People* v. *Alcala* (1984) 36 Cal.3d 604, 631, citations omitted [205 Cal.Rptr. 775, 685 P.2d 1126]; see also *People* v. *Durham* (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198].) These observations teach us that any rules governing the admission of other-crimes evidence should be fashioned with an eye toward eliminating potential prejudice and later reversal.

While limiting instructions have been utilized to minimize the degree of prejudice that flows from the introduction of other-crimes evidence, these instructions are not panaceas. As Justice Jackson once wrote, "[t]he naive assumption that prejudicial effects can be overcome by instructions to the jury, . . . all practicing lawyers know to be unmitigated fiction." (*Krule-*

[1] All statutory references are to the Penal Code.

*witch* v. *United States* (1949) 336 U.S. 440, 453 [93 L.Ed. 790, 799, 69 S.Ct. 716] (conc. opn.).) This court has observed that limiting instructions appear to call for " 'discrimination so subtle [as to be] a feat beyond the compass of ordinary minds.' " (*People* v. *Antick* (1975) 15 Cal.3d 79, 98 [123 Cal.Rptr. 475, 539 P.2d 43].) For these reasons, alternative procedures are preferred. They have the added advantage of avoiding future reversals.

In a capital case, evidence of other crimes is relevant when proving up a special circumstance but often irrelevant as to the guilt or innocence of the accused. In that situation, bifurcation of the two phases is a preferable alternative to the use of limiting instructions. That procedure, easily implemented, does not offend the rights of the state or the defendant. Further, it ensures judicial efficiency.

Section 190.1 sets forth the procedure for the trial of guilt and special circumstance allegations. That section provides that "[t]he question of the defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to [section 190.2, subdivision (a)(2) (involving a prior conviction of murder)]." (§ 190.1, subd. (a).) The statute appears to contemplate the determination of special circumstances at the "same time" as guilt. However, this language follows on the heels of a provision which directs that guilt "shall first be determined." Surely, a trial court would have the authority to bifurcate the guilt and special circumstance phases in order to avoid any prejudice.[2]

This procedure would in no way contravene the statutory preference that the same jury determine guilt and special circumstances. (§ 190.4, subd. (c); cf. §§ 1025, 1093; *People* v. *Bracamonte* (1981) 119 Cal.App.3d 644, 652-653 [174 Cal.Rptr. 191]; *People* v. *Wojahn* (1984) 150 Cal.App.3d 1024, 1034 [198 Cal.Rptr. 277] [proof of guilt and prior convictions].)

---

[2]There is some ambiguity in the precise meaning of the "same time" language found in section 190.1, subdivision (a). The statute does not require that guilt and special circumstance allegations be *tried* simultaneously. Assuming that the directive to "first determine[]" the "question of the defendant's guilt" contemplates both the presentation of evidence on and the resolution of that issue, then the trier of fact cannot, of course, "determine" the truth of any special circumstance allegations at the same time. This ambiguity is certainly substantial enough to permit bifurcation of the two phases where the prosecution seeks to introduce evidence relevant only to a charged special circumstance.

Since even that preference is subject to an exception,[3] bifurcation, a less drastic alternative, is available as a means of avoiding the introduction of prejudicial evidence at a particular phase of the proceedings.

Bifurcation would also serve judicial economy. If an accused were acquitted of the first degree murder charge or convicted of a lesser offense, no resources would be expended in litigating the admissibility of other-crimes evidence, since no special circumstance phase would be involved. If the accused were found guilty of first degree murder, no questions about the meaning of limiting instructions would be raised, since bifurcation would eliminate the need for any explanatory instructions on that subject.

Finally, the bifurcation procedure would not impair the prosecution's case. The procedure would be available only when other-crimes evidence, inadmissible as to guilt, is offered in support of a special circumstance allegation. Just as the prosecution may not withhold a stipulation as to the ex-felon status of an accused in a prosecution for possession of a firearm unless the stipulation would legitimately impair its case (*People* v. *Hall* (1980) 28 Cal.3d 143, 156-157 [167 Cal.Rptr. 844, 616 P.2d 826]), it may not place evidence before a jury at a stage where such evidence has no admissible purpose.

A bifurcation procedure has been adopted in an analogous context. In *People* v. *Bracamonte, supra,* 119 Cal.App.3d 644, the court held that an accused is entitled, upon request, to a bifurcated proceeding on the truth of prior convictions which have been alleged for the purpose of enhancing the sentence. Such a rule was found to be appropriate in view of (1) the high potential for prejudice inherent in evidence of prior criminal activity, and (2) the absence of practical obstacles which might require a unitary procedure. (*Id.*, at pp. 651-655.) That court's reasoning is applicable in the present context.

Despite these considerations, the majority enunciate a dual standard for courts to follow. With one exception, the majority adhere to the unitary procedure of a single guilt and special circumstance phase and dictate that instructions limiting the jury's consideration of other crimes evidence

---

[3]Section 190.4, subdivision (c) provides in part: "If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, . . . *unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. . . .*" (Italics added.) This provision underscores the ambiguity in section 190.1, subdivision (a), since empanelment of a new jury on special circumstances would obviously make it impossible for the trier of fact to determine the truth of any special circumstance allegations "at the same time" as guilt.

should be given. Where the evidence of other crimes is "highly prejudicial," bifurcation is permitted. (Maj. opn., *ante,* at p. 748, fn. omitted.)

While the majority's partial rule of bifurcation is a step in the right direction, the "highly prejudicial" line of demarcation is too indefinite. That standard may lead to confusion and inconsistency. Courts may have widely varying views on whether and in what circumstances other-crimes evidence is "highly prejudicial."

The rules governing the admissibility of other-crimes evidence are well-established. The definition of what is "highly prejudicial" is not. Since bifurcation of the guilt and special circumstances phases can be accomplished with relative ease, I see no reason to promulgate a rule whose application will be unclear.

## II.

The majority also hold that a felony-murder special circumstance finding is permitted if the accused is found to have committed kidnaping under section 207 *or* section 209. The clear statutory language that proof of *both* is required is ignored. (Maj. opn., *ante,* at pp. 754-756.) Although the 1978 amendment is not a model of clarity, I do not believe that the amendment can be rendered a nullity on the ground that the drafters of that provision were careless in choosing their words. (Maj. opn., *ante,* at pp. 755-756.)

As the majority note, the 1977 death penalty law provided a special circumstance for a murder which occurs during the commission or attempted commission of several felonies, including "[k]idnapping in violation of Section 207 *or* 209. . . ." (Former § 190.2, subd. (c)(3)(ii), italics added.) The 1978 amendment changed the language to the conjunctive, specifying "[k]idnapping in violation of Section*s* 207 *and* 209." (§ 190.2, subd. (a)(17)(ii), italics added.) Since the amendment is clearly " ' ' "a material change in the language" ' " *(Loew's, Inc.* v. *Byram* (1938) 11 Cal.2d 746, 750 [82 P.2d 1]), it must be given effect.[4] I do not believe that the change can be disregarded as an unintended slip of the drafters' pen, especially

---

[4]The Court of Appeal in *Talamantez* v. *Superior Court* (1981) 122 Cal.App.3d 629, 639 [176 Cal.Rptr. 800] observed that "[t]he separate enumeration of section 207 and section 209 in subsection (ii) of (17) can . . . be reasonably seen as two of the[] enumerated offenses [in paragraph (17)], also listed conjunctively, but grouped together within one subsection because of their close relationship." Unlike the majority, I find this reasoning unpersuasive.

None of the other subsections of paragraph (17) enumerates *two* offenses. Moreover, although rape, sodomy, oral copulation, and lewd and lascivious conduct are "closely related," each is enumerated separately. (See § 190.2, subd. (a)(17)(iii-vi).) These facts suggest that the amendment to subsection (ii) *was intended* to have some effect.

when an individual's eligibility for capital punishment hinges on its precise meaning.[5]

In this case, the jury was instructed only on simple kidnaping under section 207. After finding appellant guilty of that crime, the jury sustained the special circumstance allegation that the murder was committed while appellant was engaged in the commission of "kidnapping, a violation of Section 207 of the California Penal Code." Since the jury did not find that the killing occurred during the commission of kidnaping under section 209, the verdict was insufficient to sustain a felony-murder special circumstance allegation.

Respondent's petition for a rehearing was denied February 6, 1985, and the opinion was modified to read as printed above. Bird, C. J., and Lucas, J., were of the opinion that the petition should be granted.

---

[5]I am fully aware that *either* construction of the 1978 amendment renders a portion of the statute surplusage. To require proof of simple *and* aggravated kidnaping renders the reference to simple kidnaping superfluous when the aggravated kidnaping involves robbery, since simple kidnaping is a lesser included offense of kidnaping for robbery. (Maj. opn., *ante*, at p. 755, fn. 14.) However, to require proof of simple *or* aggravated kidnaping renders the reference to aggravated kidnaping superfluous in the kidnaping for robbery context, since proof of simple kidnaping alone would satisfy the statute.

Since there is no way to avoid violation of the maxim that courts should construe statutes to give every word a meaning (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081]), resort must be made to the familiar rule that the accused "is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute." (*In re Tartar* (1959) 52 Cal.2d 250, 257 [339 P.2d 553]; see *People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].)