Filed 9/17/14  P. v. Ponce CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039256 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS120239A) |
| v. | |
| FRANCISCO PEDRO PONCE, | |
| Defendant and Appellant. | |

Defendant Francisco Pedro Ponce was convicted following a court trial of robbery (Pen. Code, § 211)[1] and dissuading a witness (§ 136.1, subd. (c)(1)).  The trial court also found true a gang enhancement (§§ 186.22, subd. (b)(1)(C), 12022, subd. (b)(1)) and a knife-use enhancement (§ 12022, subd. (b)(1)).  Defendant was sentenced to a term of 16 years in prison.  On appeal, defendant argues the prosecution committed *Brady* error (*Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*)), the evidence at trial was insufficient to prove he personally used a knife, and the court improperly sentenced him to consecutive sentences for his convictions of robbery and dissuading a witness.  For the reasons set forth below, we reject defendant's contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On November 8, 2012, the district attorney filed an information charging defendant with a count of second degree robbery (§ 211) with a gang enhancement (§ 186.22, subd. (b)(1)(C)) and a count of dissuading a witness (§ 136.1, subd. (c)(1)) with a

---

[1] Further unspecified statutory references are to the Penal Code.

knife-use enhancement (§ 12022, subd. (b)(1)).  A court trial commenced on November 19, 2012.

*The Prosecution's Case*

Victim John Doe testified on his own behalf.  On February 7, 2012, Doe went to the Greenfield Public Library.  As Doe was leaving, he saw a group of individuals, including defendant, at the front of the building.  Doe decided to take an alternate route back home and walked behind the library.  Doe noticed two individuals, defendant and codefendant, Cesar Banda Alvarez, had followed him.  Defendant stood in front of Doe and said something similar to "north 14."  He also threatened to hit Doe if he called the police.

Doe said defendant held an unopened folding knife in his hand and threatened him with it.  Defendant and Alvarez accused Doe of being a Sureno gang member and said "norte, California norte."  Alvarez, who was behind Doe, put his hand in Doe's pockets.  Defendant pulled the chain off of Doe's neck and took his wallet.  Doe's cell phone was also taken.

At some point, defendant and Alvarez left Doe alone and walked away.  They returned after taking the cash out of Doe's wallet.  Alvarez handed Doe his empty wallet and warned him that if he called the police he would be killed.

At approximately 5:20 p.m. that day, Greenfield Police Department Officers Arnulfo Trevino and Francisco Ceja arrived at the library to investigate the robbery.  Officer Trevino met with Doe, who was fearful and crying.  Doe told Trevino that both defendant and Alvarez had threatened him if he contacted the police.  Officer Ceja believed Doe's description of the suspects matched defendant and Alvarez, who he knew from prior contacts.  Ceja had seen defendant and Alvarez walking toward the library approximately 30 minutes before he was dispatched.

2

Alvarez was arrested later that day at a nearby school and was found in possession of several items identified to be Doe's. During Alvarez's arrest, an unidentified man ran away from police and jumped a chain-link fence, evading capture. Alvarez was detained with another individual named Fernando Tinajero who was in possession of a knife Doe identified as the one used during the robbery. Doe identified Alvarez as one of the assailants.

Officers found a bicycle at the school where Alvarez was arrested and brought it over to defendant's home. Defendant acknowledged the bicycle was his and was identified by Doe as the second assailant. An officer identified defendant as the man who ran from the police during Alvarez's arrest. Defendant did not have any stolen property in his possession.

The prosecution presented evidence of defendant and Alvarez's gang affiliation. Deputy Sheriff Pedro Sanchez, who worked at the classification unit at the Monterey County jail, testified that defendant had admitted on prior intake questionnaires that he was a Norteno gang member and had been previously housed with other Nortenos in the jail.

Greenfield Police Department Officer Corey Smith testified Nortenos were an active criminal street gang in Greenfield. Members used the word "Norte" and the numbers "4" or "14" and commonly had tattoos reading "SF," either in reference to the San Francisco Giants or to the expression "scrap free." Defendant had an "SF" tattoo on his arm and had admitted to Smith the day before the robbery he was a Norteno gang member.

Alvarez was wearing a shirt and sweatshirt affiliated with the Norteno gang and the men he was arrested with were affiliated with the Norteno gang.

Doe was not affiliated with a gang and had no prior contacts with gangs, but the sweatshirt he was wearing at the time of the robbery, which read "So-Cali," could have

3

been perceived as supporting the Sureno street gang. Officer Smith therefore believed the robbery was committed to benefit the Norteno organization.

*Defendant's Case*

Defendant testified on his own behalf. He asserted he had told Officer Smith that he was not currently involved with the Norteno gang. He claimed he had committed a gang robbery with the Nortenos when he was a juvenile and was in the process of getting his tattoos removed. The tattoos he currently had were applied when he was 13 years old.

Defendant said he met Alvarez at approximately 4:30 p.m. the day of the robbery. He asked Alvarez if he wanted to get something to eat, and the two of them went to a nearby bakery. They stayed at the bakery for about 20 minutes and then parted ways. Defendant went to meet his girlfriend afterwards. Defendant insisted he had never met or seen Doe.

*Verdict and Sentence*

Following the trial, the court found defendant guilty of robbery and dissuading a witness and also found true the knife-use enhancement and the gang enhancement. On December 21, 2012, the court sentenced defendant to a term of 16 years in prison.

*Request to Recall Sentence*

After sentencing, defendant filed a motion to recall his sentence pursuant to section 1170, subdivision (d). The prosecution had informed defendant's counsel that Doe had been arrested for committing lewd and lascivious acts on a person under the age of 14, in violation of section 288. An officer who was not involved in defendant's robbery investigation had misspelled Doe's last name in an earlier police report entered in August 2012. When Doe was arrested in January 2013, the arresting officer recognized Doe as the victim in the robbery case. The arresting officer realized the spelling error and updated the database with the correct name. After his arrest, officers searched Doe's Facebook account and found gang-related material.

4

On April 17, 2013, the trial court declined to exercise its discretion to recall the sentence.

## DISCUSSION

On appeal, defendant raises three arguments: (1) the prosecution committed *Brady* error when it failed to disclose evidence of crimes committed by Doe, (2) there was insufficient evidence that he personally used a knife in the course of committing the crime, and (3) the court improperly imposed consecutive sentences for his convictions of robbery and dissuading a victim.

### 1. Brady *Error*

Defendant argues the prosecution committed *Brady* error, because it failed to disclose evidence that Doe had been contacting and harassing a 12-year-old girl.

At the time of defendant's trial and sentencing, the only investigation into Doe's alleged misconduct took place in August 2012. Police had contacted Doe after the father of the 12-year-old girl called the Greenfield Police Department and reported Doe had been harassing his daughter. The father told police that Doe had been following his daughter to school, driving past their house, and sending her messages on Facebook. The father had warned Doe to stop contacting his daughter, and Doe had initially agreed. However, Doe had begun calling the house again, so the father called the police. The father told police Doe had not been alone with his daughter before and had not had any physical contact with her. An officer with the Greenfield Police Department who was not involved with the robbery investigation advised Doe to stop contacting the girl, and Doe agreed. This information was documented in a police report that misspelled Doe's last name.[2]

_____

[2] In his opening brief, defendant details other allegations against Doe that were not known until after a second investigation took place in January 2013. These facts would not have been known to the police or prosecution prior to defendant's trial or his (continued)

5

Under *Brady*, *supra*, 373 U.S. 83, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Id.* at p. 87.) Accordingly, the state has a duty to disclose any favorable and material evidence even without a request. (*Ibid.*; *United States v. Bagley* (1985) 473 U.S. 667, 678; *In re Sassounian* (1995) 9 Cal.4th 535, 543.) There are three elements to a *Brady* violation. First, evidence must be suppressed, either willfully or inadvertently. (*People v. Salazar* (2005) 35 Cal.4th 1031, 1035.) Second, the suppressed evidence must be favorable to the prosecution, meaning it "either helps the defendant or hurts the prosecution" (*In re Sassounian*, *supra*, at p. 544) in that it is exculpatory or has impeachment value. (*Strickler v. Greene* (1999) 527 U.S. 263, 282 (*Strickler*).) Lastly, the suppressed evidence must be material, meaning there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." (*United States v. Bagley*, *supra*, at p. 682.)

"Moreover, the rule encompasses evidence 'known only to police investigators and not to the prosecutor.' [Citation.] In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.' " (*Strickler*, *supra*, 527 U.S. at pp. 280-281.)

On appeal, a defendant has the burden to establish the elements of a *Brady* violation. (*Strickler*, *supra*, 527 U.S. at pp. 289, 291.) "Conclusions of law or of mixed questions of law and fact, such as the elements of a *Brady* claim [citation], are subject to independent review. [Citation.] Because the [trier of fact] can observe the demeanor of

sentencing, as Doe was arrested *after* defendant was sentenced in December 2012. Accordingly, these additional facts are not relevant to our analysis.

the witnesses and their manner of testifying, findings of fact, though not binding, are entitled to great weight when supported by substantial evidence." (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1042.)

It appears the first element of a *Brady* violation, suppression of evidence, is satisfied. Although the prosecution did not willfully withhold evidence from the defense, a *Brady* violation may occur even if the suppression is inadvertent. (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1035.) The Greenfield Police Department investigated both the robbery and Doe's alleged acts involving the 12-year-old girl, therefore this falls under the category of evidence " 'known only to police investigators and not to the prosecutor.' " (*Strickler*, *supra*, 527 U.S. at pp. 280-281.)

The other two elements of a *Brady* violation, whether the evidence was favorable to the defense and whether the evidence was material to the verdict, present a more challenging analysis.

First, defendant argues the evidence was favorable, because it possessed impeachment value against the prosecution's sole witness to the crime, Doe. (*Strickler*, *supra*, 527 U.S. at p. 282.) Generally, misconduct that does not result in a felony conviction can be admissible to impeach a witnesses' credibility if it involves moral turpitude, because it has " ' "some tendency in reason" [citation] to shake one's confidence in [the witness'] honesty.' " (*People v. Wheeler* (1992) 4 Cal.4th 284, 295.) " ' "Moral turpitude" means a general " 'readiness to do evil' " [citation], i.e., "an act of baseness, vileness or depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." ' " (*People v. Sanders* (1992) 10 Cal.App.4th 1268, 1272.)

It is unclear whether evidence of Doe's alleged misconduct falls into the category of impeachment evidence arising from an act of moral turpitude. No arrest came from

7

the police investigation of Doe's interactions with the 12-year-old girl during the pendency of defendant's trial. Additionally, Doe's conduct, as described in the police report, consisted of sending the girl messages, following her, and driving by the family's house. The report asserted Doe was never alone with the girl and did not have physical contact with her. Defendant claims these acts would, at the very least, amount to an offense of annoying or molesting a child under the age of 18, a violation of section 647.6, and any charge involving child molestation is a crime of moral turpitude. (*People v. Massey* (1987) 192 Cal.App.3d 819, 823.) However, we need not draw a definitive conclusion on this issue, because even if we were to assume this evidence *was* favorable, we find the last element of a *Brady* violation, materiality, is not met.

"Materiality . . . requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result." ' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.)

" 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime," [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citations]. In contrast, a new trial is generally not required when the testimony of the witness "is corroborated by other testimony." ' " (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1050.)

In *People v. Letner and Tobin* (2010) 50 Cal.4th 99 (*Letner*), our high court determined that the prosecution's failure to turn over evidence of a witness' outstanding warrant for a misdemeanor petty theft charge and two pending criminal matters for writing bad checks and theft of clothing were not material under *Brady*. (*Id.* at pp. 174-

175, 177-178.)  In *Letner*, the witness at issue did not provide the only evidence linking the defendant to the crime.  (*Id*. at pp. 176-177.)  However, the *Letner* court determined that even if it were to conclude the witness' testimony constituted a critical element of the prosecution's case, it "would agree with the trial court's assessment that the undisclosed information concerning [the witness'] pending criminal matters would not have undermined her credibility to any significant degree."  (*Id*. at p. 177.)

The *Letner* court observed that "none of the charges against [the witness] was particularly serious, and therefore the jury might not have found compelling the theory that [the witness] perjured herself at defendants' capital trial in order to obtain some relatively minor benefit in her own pending matters.  In addition, the possibility that the charges would have had material impeachment value is contradicted by [the witness'] declaration submitted with the opposition to defendants' motions for new trials, in which she stated she did not speak with the prosecutor about the pending charges, did not expect or receive any benefits for testifying, did not alter her testimony as a result of the pending matters, and had requested (and the court had ordered) that her jail sentence be suspended so she would not be in jail while defendants also were incarcerated there."  (*Letner*, *supra*, 50 Cal.4th at p. 177.)  Additionally, the witness' testimony was consistent with her preliminary hearing testimony before any theft charges had been filed.  Furthermore, the jury had before it evidence that negatively impacted the witness' credibility such as her personal bias against the defendant and the inconsistencies between her statements to the responding police officer and her trial testimony.  (*Id*. at pp. 177-178.)

Moreover, the *Letner* court noted that "misdemeanor *convictions* are inadmissible under the hearsay rule and furthermore, with reference to the underlying *facts* of misdemeanor offenses, that trial courts retain the authority to exclude such evidence

9

under section 352 of the Evidence Code[3] if presentation of those facts would create undue prejudice, delay, or confusion, substantially outweighing their probative value." (*Letner*, *supra*, 50 Cal.4th at p. 178.)  Additionally, " 'a misdemeanor--or any other conduct not amounting to a felony--is a less forceful indicator of immoral character or dishonesty than is a felony.' " (*Ibid*.)

Similarly, here the only evidence of Doe's misconduct that could have been disclosed to the defense prior to defendant's sentencing was the August 2012 police report summarizing Doe's conduct toward the 12-year-old girl.  As we previously noted, evidence of conduct involving moral turpitude may be admissible for impeachment purposes.  However, such evidence is subject to exclusion under Evidence Code section 352.  Evidence of misdemeanor conduct in particular may be more subject to exclusion, because "a misdemeanor--or any other conduct not amounting to a felony--is a less forceful indicator of immoral character or dishonesty than is a felony" (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296), and its use at trial "entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present."  (*Ibid*.)

In this situation, Doe's conduct did not result in a misdemeanor conviction or an arrest at the time of defendant's trial and sentencing.  Evidence of an arrest has little, if any, probative value because it has not been proven the individual has committed a crime or done anything wrong.  Evidence of alleged acts of misconduct that did not result in arrest has even less probative value and could be highly prejudicial.  Presenting evidence of uncharged offenses can be so prejudicial that its admission requires extremely careful analysis and, since substantial prejudicial effect is inherent in such evidence, uncharged

---

[3] Evidence Code section 352 provides a court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

10

offenses are admissible only if they have substantial probative value. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.) Here the evidence has little probative value. Doe's alleged misconduct involved an entirely collateral incident that had no relation to the robbery. Therefore, it is unlikely the underlying conduct would have been admissible to impeach Doe.

Additionally, defendant has not shown there is a reasonable possibility disclosure of the suppressed evidence would have produced a different verdict. (*Strickler*, *supra*, 527 U.S. at p. 289.) Defendant argues "the case was presented as the archetypal story of predators attacking a vulnerable victim[, Doe]." Therefore, he claims admission of the evidence would have undermined Doe's credibility.

However, this is not a situation where Doe's alleged acts somehow cast doubt on his ability to identify defendant as one of the individuals who robbed him or on the existence of the robbery itself. Nor is this a situation where the impeachment material contradicts a crucial part of Doe's testimony. There is also no evidence that Doe testified about the robbery in exchange for leniency in his own criminal case, because he was not arrested for his alleged misconduct until after defendant was sentenced. In sum, the alleged acts of misconduct have minimal impeachment value.

Moreover, Doe's testimony was partially corroborated by other evidence. An officer testified he saw defendant and Alvarez walking toward the library before the robbery took place. Alvarez was arrested in possession of some of the items taken from Doe, and defendant was identified by an officer as the individual fleeing from the scene of Alvarez's arrest.

In short, we are unconvinced that if this evidence was disclosed, it is reasonably probable defendant would have received a different result. (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043.) We therefore reject defendant's claim of *Brady* error.

11

2. *Sufficiency of the Evidence*

Next, defendant argues there is insufficient evidence he personally used a knife in the commission of the robbery.

Section 12022, subdivision (b)(1) states "[a] person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."

The Supreme Court has explained in the analogous context of a firearm use enhancement that "use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' (Webster's New Internat. Dict. (3d ed. 1961).)" (*People v. Chambers* (1972) 7 Cal.3d 666, 672.) Therefore, in order to support a finding that defendant "used" a deadly weapon, there must be evidence showing he was more than merely "armed" with a knife. (*Ibid.*) Courts have concluded that "use" of a knife can include intentionally displaying the knife in order to further the crime. (*People v. Wims* (1995) 10 Cal.4th 293, 302.)

The applicable standard of review is well settled. "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--evidence that is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same

12

standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129; see also *People v. Meza* (1995) 38 Cal.App.4th 1741, 1745.)

Defendant argues that the knife's role in the robbery was de minimis, because the knife was not displayed in a menacing manner. (*People v. Wims*, *supra*, 10 Cal.4th at p. 302.) We disagree with defendant's characterization of the crime. Here, there is evidence supporting the trial court's finding that defendant used a knife during the commission of the robbery by threatening Doe. Doe testified that defendant held an unopened folding knife during the robbery. He also testified that defendant threatened him with the knife, and at one point defendant "took up the knife" during the robbery.[4]

Given Doe's testimony, we conclude sufficient evidence supported the knife-use enhancement.

3. *Section 654*

Lastly, defendant argues the trial court erred in imposing consecutive terms for his convictions of robbery and dissuading a witness. He argues the trial court violated section 654 because his two crimes were committed in a single indivisible course of conduct and did not have separate intents and objectives.

During defendant's sentencing, the trial court stated: "The Court finds [the robbery and dissuading a witness convictions] are two separate crimes. The robbery had been completed. There was no necessity to then issue the additional threats and

---

[4] In his opening brief, defendant states "the prosecutor's efforts to get Doe to testify that he was threatened with the knife were unavailing." This characterization of Doe's testimony is misleading. During his testimony, the prosecutor asked Doe what defendant was doing with the knife. Doe answered that he was "showing it to" him. The prosecutor asked Doe if he was showing it in a "friendly way," and Doe responded: "No. He was threatening me with it."

13

dissuasion because the defendants had obtained the victim's property and were removing themselves from the scene."

Section 654 provides: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

"[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction. [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor." (*People v. Perez* (1979) 23 Cal.3d 545, 551.) If all the offenses were incident to one objective, the defendant may not be punished for more than one, e.g., a defendant who attempts murder by setting fire to the victim's bedroom could not be punished for both arson and attempted murder, because his primary objective was to kill, and the arson was the means of accomplishing that objective and thus merely incidental to it. (*Ibid*.) "On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*Ibid*.) For example, the objectives to drive while intoxicated and to drive with a suspended license were separately punishable, though they occurred simultaneously. (*Id*. at p. 552.) The purpose of the protection against multiple punishments is to ensure the defendant's punishment will be commensurate with his criminal culpability. (*Id*. at p. 552, fn. 4.)

Whether a defendant's crimes involved multiple objectives is generally a factual question for the sentencing court, and we will uphold a court's determination on this

14

matter if it is supported by substantial evidence. (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

Defendant claims *People v. Guzman* (1996) 45 Cal.App.4th 1023 is applicable. In *Guzman*, the victim witnessed several men burglarize his garage and take off in a truck with a motorcycle. (*Id*. at p. 1025.) The victim chased after the men in an effort to reclaim the motorcycle. He caught up to the men, attempted to stop them, and was beaten. (*Id*. at p. 1026.) The victim pursued again and the men were later apprehended. One of the men was convicted of robbery and grand theft. The appellate court reversed the trial court's imposition of a separate punishment for burglary and robbery, concluding that both offenses were committed pursuant to one objective and there was a single course of conduct, because the victim was beaten when the men used force during the ongoing burglary to retain the motorcycle. (*Id*. at p. 1028.)

Additionally, defendant cites to *People v. Perry* (2007) 154 Cal.App.4th 1521 (*Perry*). Like *Guzman*, the *Perry* court was confronted with a situation where a defendant was convicted of both robbery and burglary. In *Perry*, the court concluded the defendant's robbery and burglary had the same underlying objective, to steal the victim's car stereo. (*Id*. at p. 1527.) Therefore, the court concluded it could not find the defendant acted with multiple independent objectives in committing the crimes and stayed the defendant's sentence for his conviction of burglary. (*Ibid*.)

*Guzman* and *Perry* are distinguishable. Here, substantial evidence supports the court's conclusion that defendant's crimes were committed with different objectives. Doe testified that defendant and Alvarez followed him behind the library and took his wallet, chain, and cell phone. At some point, defendant and Alvarez walked away from Doe and took the money out of Doe's wallet. Defendant and Alvarez then returned Doe's empty wallet, threatening to kill him if he called the police. "It is one thing to commit a criminal act in order to accomplish another; Penal Code section 654 applies there. But

15

that section cannot, and should not, be stretched to cover gratuitous violence or other criminal acts far beyond those reasonably necessary to accomplish the original offense." (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.) Defendant and Alvarez's intent in committing the robbery was to take Doe's valuables. The intent and objective behind threatening Doe if he contacted the police was to prevent police involvement and to evade prosecution. The two crimes are therefore divisible.

Defendant argues that the robbery was not complete at the time he and Alvarez threatened Doe, because they had not reached a temporary place of safety. Defendant is correct that a robbery may not be considered complete until the perpetrator reaches a temporary place of safety. (*People v. Bigelow* (1984) 37 Cal.3d 731, 753-754.) However, the test of a violation of section 654 is not whether the crime was complete, but is whether the perpetrator had separate intents and objectives. (See *People v. Nguyen*, *supra*, 204 Cal.App.3d at p. 193 ["If the trier of fact determines the crimes have different intents and motives, multiple punishments are appropriate. This is so notwithstanding that for purposes of the felony-murder rule the robbery is still considered to be ongoing."].) "The moment at which a defendant committed all of the elements of an offense is immaterial in applying Penal Code section 654." (*Perry*, *supra*, 154 Cal.App.4th at p. 1527.) Therefore, the fact that the robbery was incomplete at the time the threats to Doe were issued does not insulate defendant under section 654.

In sum, substantial evidence supported the trial court's conclusion that the two crimes were committed with different intents and objectives.

### DISPOSITION

The judgment is affirmed.

16

_____<br>Premo, Acting P.J.

WE CONCUR:


_____<br>Elia, J.


_____<br>Mihara, J.